# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| **SUZANNE MARGARET BASSO,** | § | |
| **Petitioner** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. H-07-3047** |
| | § | |
| **NATHANIEL QUARTERMAN,** | § | **DEATH PENALTY CASE** |
| **Director, Texas Department of** | § | |
| **Criminal Justice, Correctional** | § | |
| **Institutions Division, Respondent** | § | |

## MEMORANDUM IN SUPPORT OF
## APPLICATION FOR RELIEF UNDER 28 U.S.C. §2254
## BY A PERSON IN STATE CUSTODY

Winston E. Cochran, Jr.
Attorney at Law
Texas Bar No. 04457300
SD Texas No. 14490
P.O. Box 38465
Houston, TX 77238-8465
Tel. (713) 228-0264

Counsel for Petitioner

# **TABLE OF CONTENTS**

Table of Authorities                                                              iii

Statement of Jurisdiction                                                          1

Statement of the Case                                                             2

Issues Presented                                                                  6

Argument and Authorities                                                         10

   A.  Principles Governing Habeas Review                            10

   B.   Issues Affecting Guilt                                        12

      Argument Supporting Claims One, Two, and Three    12

      Argument Supporting Claims Four and Five          18

      Waiver of Claim Six                               23

      Argument Supporting Claim Seven                   24

   C.   Issues Affecting Competency Hearing                           31

      Argument Supporting Claim Eight                   31

      Argument Supporting Claim Nine                    33

   D.   Issues Affecting Punishment                                   37

      Argument Supporting Claims Ten and Eleven         37

      Argument Supporting Claim Twelve                  70

      Argument Supporting Claims Thirteen               71

      Argument Supporting Claim Fourteen                72

Argument Supporting Claim Fifteen      73

Argument Supporting Claims Sixteen and Seventeen      81

Argument Supporting Claim Eighteen      83

Argument Supporting Claims Nineteen, Twenty, and Twenty-One      86

Argument Supporting Claim Twenty-Two      88

Request for an Evidentiary Hearing      88

Conclusion      89

Certificate of Service      89

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

*Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)           44

*Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348,
    147 L.Ed.2d 435 (2000)                                  74-80

*Aston v. State*, 656 S.W.2d 453 (Tex. Crim. App. 1983)                        25

*Basso v. State*, No. 73,672 (Tex. Crim. App. 2003)
    (2003WL1702283)                                         3

*Basso v. Texas*, 540 U.S. 864, 124 S.Ct. 174, 157 L.Ed.2d 116 (2003)          3

*Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531,
    159 L.Ed.2d 403 (2004)                                   77-78

*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)         19, 22

*Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985)  87

*California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987)       40

*Chambers v. Mississippi*, 410 U.S. 283, 93 S.Ct. 1038,
    90 L.Ed.2d 636 (1973)                                    16

*Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986)       16, ss

*Eddings v. Oklahoma*, 455 U.S. 1, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)          39

*Ex parte Duffy*, 607 S.W.2d 507 (Tex. Crim. App. 1980)                        38

*Ex parte Gonzalez*, 204 S.W.3d 391 (Tex. Crim. App. 2006)                     41, 64, 88

*Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346(1972)         23

*Gilmore v. Taylor*, 508 U.S. 333, 113 S.Ct. 2112, 124 L.Ed.2d 306 (1993)      70, 83

*Granados v. Quarterman*, 455 F.3d 529(5th Cir. 2006) 78-80

*Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853,
 122 L.Ed.2d 203 (1993) 70, 83, 87

*Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) 17

*Jones v. United States*, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) 87

*Kansas v. Marsh*, __ U.S. __, 126 S.Ct. 2524, __ L.Ed.2d __ (2006) 75

*Lawton v. State*, 913 S.W.2d 542 (Tex. Crim. App. 1995) 74

*Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) 39

*Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001) xx

*Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) 39-40

*People v. Anderson,* 25 Cal.4th 543, 106 Cal.Rptr.2d 575, 22 P.3d 347 (2001) 77

*People v. Nitz*, 319 Ill.App.3d 949, 254 Ill.Dec.281, 747 N.W.2d 38 (2001) 76

*Perry v. State*, 158 S.W.3d 438 (Tex. Crim. App. 2004) 78

*Phillips v. State*, 701 S.W.2d 875 (Tex. Crim. App. 1985),
 *cert. denied* 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 574 (1986) 43, 47

*Powell v. Alabama,* 287 U.S. 45, 53 S.Ct 55. 77 L.Ed. 158 (1932) 38

*Resendiz v. State*, 112 S.W.3d 541 (Tex. Crim. App. 2003) 78

*Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) 14-15

*Ring v. Arizona*, 536 U.S.584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) 75

*Robinson v. Polk*, 444 F.3d 225 (4th Cir. 2006) 10

*Rompilla v. Beard*, 545 U.S. 374,125 S.Ct. 2456, 162 L.Ed.2d 360 (2005) 41-42

*Rosales v. State*, 841 S.W.2d 368(Tex. Crim. App. 1992)                     22

*Rowell  v. Dretke*, 398 F.3d 370 (5th Cir. 2005)                          78

*Scheanette v. Quarterman*, 482 F.3d 815 (5th Cir. 2007)                   80

*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052,
80 L.Ed.2d 674 (1984)                                                   passim

*Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973)   17

*Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989)        11

*Tennard v. Dretke*, 542 U.S. 274, 124 S.Ct. 2562,
159 L.Ed.2d 384 (2004)                                               42-43, 65

*Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964)        22

*United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738,
160 L.Ed.2d 621(2005)                                                    77-78

*Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)   74-75

*Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)     16

*Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)      40

*Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495,
146 L.Ed.2d 389 (2000)                                              10, 40, 47

## Constitutional Provisions, Statutes and Rules

28 U.S.C. §2254                                                          passim

TEX. CODE CRIM. PROC. Art. 37.071, §2(d)                                     83

TEX. CODE CRIM. PROC. Art. 37.071, §2(e)(1)                                  73

TEX. CODE CRIM. PROC. Art. 37.071, §2(f)(2)                                  74

TEX. CODE CRIM. PROC. Art. 37.071, §2(g)                                      74

TEX. CODE CRIM. PROC. Art. 38.14                                             25

TEX. R. EVID. 503                                                            34

U.S. CONST. Amend. V                                                          7

U.S. CONST. Amend. VI                                                   passim

U.S. CONST. Amend. VIII                                          7-9, 39, 70, 86

U.S. CONST. Amend. XIV                                   7-8, 12, 18, 37, 70, 86

## <u>Scholarly Texts</u>

Fabian, "Death Penalty Mitigation and the Role of the Forensic
    Psychologist" 27 LAW & PSYCHOL. REV. 55 (2003)                          45

Garbarino *et al.*, *The Psychologically Battered Child* (1986)             68

President's Commission on Law Enforcement and Administration of Justice,
    *The Challenge of Crime in a Free Society* (1967)                    66-67

Renvoiz, *Innocence Destroyed: A Study of Child Sexual Abuse* (1993)         58

Scott, "Juvenile Violence," 22 THE PSYCHIATRIC CLINICS OF NORTH
AMERICA: FORENSIC PSYCHIATRY 71, 75 (March 1999)                            69

**TO THE HONORABLE COURT:**

COMES NOW the petitioner, Suzanne Margaret Basso (also known as Susan Margaret Basso), and respectfully submits this memorandum of law in support of a requests that this Court grant relief under 28 U.S.C. §2254, said relief having been requested in an application filed in this cause on September 20, 2007. The petitioner requests that this Court vacate the judgment of the 232nd District Court of Harris County, Texas, either in total or as to punishment.

## STATEMENT OF JURISDICTION

This proceeding is brought under 28 U.S.C. §2254 by an inmate presently incarcerated in the Texas Department of Criminal Justice, Correctional Institutions Division, under a sentence of death. The judgment and sentence were entered in the 232nd District Court of Harris County, Texas, which is within the Southern District of Texas, Houston Division. The petitioner alleges that, for reasons set forth herein, she is being illegally confined. More specifically, the judgment and sentence of the state district court were affected by procedures in violation of various provisions of federal constitutional law. An application raising these claims was filed on September 20, 2007, vesting this Court with jurisdiction.

## STATEMENT OF THE CASE

### A.  Procedural History

The petitioner was indicted for Capital Murder in Cause Number 816855 in the 232nd District Court of Harris County, Texas.  It was specifically alleged that the petitioner killed Louis Musso in the course of a kidnaping, and that the petitioner killed Musso for the purpose of financial gain "through proceeds from an insurance policy on Louis Musso in which Suzanne Basso is the named beneficiary as well as other assets in which Suzanne Basso is the named heir" (CR I-2).[1]  A jury found the petitioner guilty as charged. The jury subsequently answered special issues submitted under TEX. CODE CRIM. PROC. Art. 37.07, §2 adversely to the petitioner, requiring the trial court judge to assess the death penalty.  Judgment was entered on September 1, 1999.  The petitioner filed a motion for new trial, which was denied after an evidentiary hearing.

Appeal to the Texas Court of Criminal Appeals was automatic.  The petitioner raised twenty-five issues on appeal.[2] The petitioner's conviction was affirmed in an

---

[1]  In the individual discussions, citations to the record are as follows: "CR" is the clerk's record of state district court documents, which contains multiple volumes designated as "I through I-E."  The reporter's record is designated by "RR" with Roman numerals for volume numbers of numbered volumes, and dates given for volumes not numbered on their covers. Exhibits which were appended to the state habeas application were filed with this Court on September 20, 2007.  They will be referred to as "Pet. App." with the same alphabetical designation as was used in the state habeas application.

[2]  The issues presented in the main brief on direct appeal included: Involuntary medication during trial without notice to defense counsel; denial of funds for medical expert;

2

unpublished opinion on January 15, 2003. *Basso v. State*, No. 73,672 (Tex. Crim. App. 2003)(2003WL1702283). The United States denied a writ of certiorari on October 6, 2003. *Basso v. Texas*, 540 U.S. 864, 124 S.Ct. 174, 157 L.Ed.2d 116 (2003).

The petitioner's postconviction writ application had to be filed under TEX. CODE CRIM. PROC. Art. 11.071 by September 12, 2001. That was so even though the petitioner's direct appeal was still pending in the Court of Criminal Appeals on that date.[3] Accordingly, some of the state habeas issues were simply incorporations

---

denial of ex parte hearing on funding motions; ineffective assistance of counsel due to failure to request appointment of medical experts; State's failure to disclose exculpatory information and grant of continuance for only one day to respond to late disclosure; ineffective assistance of counsel in failure to object to opinion testimony about abuse of J.D. O'Malley; ineffective assistance of counsel in failure to request accomplice-witness instruction regarding Hope Ahrens; denial of motion to quash indictment; denial of motion for change of venue; denial of motion to suppress statement; admission of hearsay statement of victim; improper voir dire of jury for mid-trial competency hearing; exclusion of testimony at competency hearing; admission of testimony about co-defendant's confession; errors in charging the jury on manner of assault and on remuneration element; and improper instruction on the law of parties. In a supplemental brief the petitioner raised the failure to assign the State the burden of proof on the mitigation issue.

[3] The state habeas issues were set forth as follows, with the term "applicant" being used in place of "petitioner:'

1 and 2. The applicant was denied the effective assistance of counsel at the punishment stage of trial, in violation of U.S. CONST. Amend. VI and TEX. CONST. Art. I, §10, when counsel failed to present mitigating evidence, due to inadequate investigation or because counsel was obstructed in that task by the applicant's mental condition, or because counsel was obstructed by the administration of medication to the applicant without defense counsel's knowledge.

3 and 4. The applicant was denied the effective assistance of counsel on the issue of competency, in violation of U.S. CONST. Amend. VI and TEX. CONST. Art. I, §10, because significant background information which supported defense

expert Quijano and undermined State's expert Brown was not presented.

5.   The applicant was denied effective assistance of counsel because counsel provided evidence against the appellant at the competency hearing.

6 and 7.   The applicant was denied the effective assistance of counsel on the issue of guilt, in violation of U.S. CONST. Amend. VI and TEX. CONST. Art. I, §10, because counsel failed to object to the jury charge on the grounds that Hope Ahrens was not named as an accomplice witness (Reiteration of direct-appeal issue number ten).

8.   The applicant received ineffective assistance of counsel by counsel's failure to specifically request funds for a medical expert to perform an EMG and biopsy of the applicant's muscles and nerves prior to trial (Reiteration of direct-appeal issue number five).

9. The applicant was denied effective assistance of counsel at punishment (Reiteration of direct-appeal issue number six).

10. The applicant was denied effective assistance of counsel by counsel's failure to objet to the testimony of Scott and Christiana Hardy that the applicant reduced J.D. O'Malley's brain functioning from that of a 17 year old to a 12 year old by the applicant's continued beatings of J.D. O'Malley (Reiteration of direct-appeal issue number nine).

11.   The applicant was denied a reliable determination of competency to stand trial, in violation of U.S. CONST. Amends. VIII and XIV, because significant background information which supported defense expert witness Quijano and undermined State's expert Brown was not presented.

12.   The applicant was denied a reliable determination of punishment, in violation of U.S. CONST. Amends. VIII and XIV, because significant mitigation evidence was not presented.

13.    The court erred in denying a motion to quash the indictment with respect to the purported remuneration, in violation of U.S. CONST. Amends. V and VI, as applicable via U.S. CONST. Amend. XIV.

14.   The indictment and the jury charge failed to assure a unanimous verdict in a capital case, denying the applicant due process of law under U.S. CONST. Amend. XIV.

15.   A new trial should be ordered because the failure of Texas law to allocate the

of the direct-appeal issues, while some – most notably the main ineffective-assistance claim – were raised for the first time in the state habeas proceedings. The district court recommended that relief be denied, and the state writ application was denied on September 20, 2006. The petitioner filed a suggestion of reconsideration on the Court's own motion, which also was denied.

## B.  Factual Background

The salient facts from the trial were adequately set out in the Court of Criminal Appeals' opinion, so for present purposes the petitioner will adopt the summary of the facts in that opinion (2003 WL 1702283) as the factual background and will fill

---

burden of proof on mitigation to the State impaired the representation of the applicant at several stages of trial.

16 and 17.   The court's refusal to read back Dr. Quijano's testimony, pursuant to a Texas statutory restriction, violated the applicant's Eighth Amendment right to greater reliability in the jury's determination of punishment-stage issues and the applicant's Fourteenth Amendment right to due process of law.

18, 19, and 20.   The jury charge affirmatively misled the jury as to the numerical requirements for answers to special issues which would lead to life imprisonment, vitiating the Sixth Amendment right to trial by jury, violating the Eighth Amendment because it undermined the reliability of the verdict, and violating Fourteenth Amendment due process of law.

21 and 22.   The court denied the applicant a trial satisfying the Eighth Amendment's heightened reliability requirement and denied the applicant a unanimous verdict, as required to meet due process of law in a Texas capital case, by not answering the jury's specific request for a definition of the key phrase "criminal acts of violence."

23.   If grounds 8-22 should have been presented on direct appeal, then appellate counsel was ineffective.

in other pertinent facts in the individual discussions of the petitioner's various claims. Briefly summarized, the evidence showed that the beaten body of Louis "Buddy" Musso, a mildly retarded man who had come to Texas from New Jersey, was found in Galena Park, Texas on August 26, 1998 (RR XXIII-94 *et seq.*). At the time Musso was living with the petitioner, believing that she wanted to marry him. Reality was far different. Musso was repeatedly physically abused by J.D. O'Malley (the petitioner's son), Terence Singleton, and Hope Ahrens, with the encouragement of the petitioner. Ahrens said the petitioner had directly participated in physically abusing Musso at various times. Musso eventually was killed by a blow to the head (RR XXIV-24). The State's theory was that the petitioner aimed to gain financially by becoming an economic beneficiary of Musso's death, although there was no evidence that the petitioner ever obtained any such benefit.[4]

## **ISSUES PRESENTED**

The following issues of constitutional law were presented by the petitioner's Section 2254 application, filed on September 20, 2007:

(1) The petitioner was denied due process of law, under U.S. CONST. Amend. XIV, specifically by interference with a right to put on a complete defense, because she was placed under medication during trial without notice to counsel.

---

[4] A purported will of Musso, found in the petitioner's home, made the petitioner his sole heir (RR XXV-119). The petitioner was named as a beneficiary in a burial insurance policy, not in any of Musso's other policies, and the burial policy never took effect because no payments had been made on the policy (RR XXVI-200).

(2)  The petitioner was denied due process of law, under U.S. CONST. Amend. XIV, specifically by causing an unfavorable appearance in court,  because she was placed under medication during trial without notice to counsel.

(3) The petitioner was denied effective assistance of counsel, under U.S. CONST. Amend. VI, because she was placed under medication during trial without notice to counsel.

(4) The petitioner was denied due process of law under U.S. CONST. Amend. XIV when the trial court granted only a one-day continuance in response to belated revelation of potentially exculpatory material.

(5) The petitioner was denied due process of law under U.S. CONST. Amend. XIV when the State failed to reveal potentially exculpatory material regarding the conduct of the Galena Park Police Department.

(6) The trial court erred in denying the motion to quash with respect to purported remuneration, in violation of U.S. CONST. Amends. V and VI, applicable via U.S. CONST. Amend. XIV.

(7)  The petitioner was denied the effective assistance of counsel on the issue of guilt, in violation of U.S. CONST. Amend. VI, because counsel failed to object to the jury charge on the grounds that Hope Ahrens was not named as an accomplice witness.

(8)  The petitioner was denied the effective assistance of counsel on the issue of competency, in violation of U.S. CONST. Amend. VI, because significant background information which supported defense expert Quijano and undermined State's expert Brown was not presented.

(9) The petitioner was denied effective assistance of counsel on the issue of competency, in violation of U.S. CONST. Amend. VI, because counsel provided information used against the petitioner at the competency trial.

(10) The petitioner was denied the effective assistance of counsel at the punishment stage of trial, in violation of U.S. CONST. Amend. VI, when counsel failed to present mitigating evidence, largely because of

inadequate investigation, and secondarily because of the petitioner's mental condition.

(11) The petitioner was denied due process of law under U.S. CONST. Amend. XIV when the trial court refused to fund a mitigation expert.

(12) The petitioner was denied a reliable determination of punishment, in violation of U.S. CONST. Amends. VIII and XIV, because significant mitigation evidence was not presented.

(13) The petitioner was denied the effective assistance of counsel on the issue of guilt, in violation of U.S. CONST. Amend. VI, because counsel did not request a particular specialist on nerve damage.

(14) The petitioner was denied effective assistance of counsel by counsel's failure to object to the testimony of Christianna Hardy O'Malley that the petitioner reduced J.D. O'Malley's brain functioning by the petitioner's continued beatings of J.D. O'Malley.

(15) The trial court erred in failing to instruct the jury that the State had the burden of proof beyond a reasonable doubt on the mitigation issue at the punishment stage of trial, denying the petitioner due process of law under U.S. CONST. Amend. XIV.

(16) The court's refusal to read back Dr. Quijano's testimony, pursuant to a Texas statutory restriction, violated the petitioner's Eighth Amendment right to greater reliability in the jury's determination of punishment-stage issues.

(17) The court's refusal to read back Dr. Quijano's testimony, pursuant to a Texas statutory restriction, violated the petitioner's Fourteenth Amendment right to due process of law.

(18) The court denied the petitioner a trial satisfying the Eighth Amendment's heightened reliability requirement by not answering the jury's specific request for a definition of the key phrase "criminal acts of violence."

(19) The jury charge affirmatively misled the jury as to the numerical

requirements for a negative answer to special issues which would lead to life imprisonment, violating the Sixth Amendment right to trial by jury.

(20) The jury charge affirmatively misled the jury as to the numerical requirements for a negative answer to special issues which would lead to life imprisonment, violating the Eighth Amendment because it undermined the reliability of the verdict.

(21) The jury charge affirmatively misled the jury as to the numerical requirements for a negative answer to special issues which would lead to life imprisonment, in violation of the Fourteenth Amendment due process clause.

(22) If any issues raised on state habeas was procedurally defaulted by not being raised on direct appeal, the petitioner received ineffective assistance of counsel on appeal.

Upon further study, the petitioner believes she cannot show that the state court decision as to the sixth claim was objectively unreasonable, and she waives that claim. The remaining issues are arranged with guilt-stage issues first, competency issues second, and punishment-stage issues last, but that does not necessarily reflect the relative strength of the issues. The single most important issue probably is the ineffective assistance issue regarding inadequate mitigation investigation, although this Court should examine all of the issues carefully.

## ARGUMENT AND AUTHORITIES

### A.  PRINCIPLES GOVERNING FEDERAL REVIEW

The applicable statute, 28 U.S.C. §2254 (d), places some limitations upon the legal bases for relief. Neither this Court nor the district court may grant relief:

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) explained that it is not enough, under subsection (1), for a federal court to believe that a state court decision applied federal law incorrectly, unless the court also finds that the state court's application of the law was "objectively unreasonable."  What that means was correctly explained in a dissenting opinion in *Robinson v. Polk*, 444 F.3d 225 (4th Cir. 2006):

> The scope of our review for unreasonableness under AEDPA, however, is defined not simply by the factual similarity between the relevant Court precedents and the case on review, but by whether the legal principle embodied in those precedents reasonably must control in the factual context of the case on review. See *Williams (Terry) v. Taylor*, 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)(observing that a state court decision involves an unreasonable application of Supreme Court precedent when it 'unreasonably refuses to extend [a

legal] principle to a new context where it should apply"). A legal principle, by definition, applies to diverse factual scenarios. And those factual scenarios can differ in innumerable ways, so long as they are analogous on the point to which the legal principle applies.

444 F.3d at 232.

Applicants under Section 2254 must overcome the procedural hurdles of the "clearly established" clause, applied as of the date a direct appeal becomes final, and the retroactivity doctrine which was implemented in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). What this means for the petitioner is that the State courts' decisions must be evaluated to determine whether they correct applied Supreme Court case law which existed as of October 6, 2003, when the conviction became final on direct appeal. *Basso v. State*, No. 73,672 (Tex. Crim. App. 2003)(2003WL1702283), *cert. denied* 540 U.S. 864, 124 S.Ct. 174, 157 L.Ed.2d 116 (2003). Under an "unreasonable application" analysis, however, it can be appropriate to consider other types of decisions – federal or state decisions which are not from the Supreme Court, or later Supreme Court cases – for comparative purposes to determine how "reasonable" the application of law by the State courts was.

## B.  ISSUES AFFECTING GUILT

### ARGUMENT SUPPORTING
### CLAIMS ONE, TWO, AND THREE

**The petitioner was denied due process of law, under U.S. CONST. Amend. XIV, specifically by interference with a right to put on a complete defense, because she was placed under medication during trial without notice to counsel.**

**The petitioner was denied due process of law, under U.S. CONST. Amend. XIV, specifically by causing an unfavorable appearance in court,  because she was placed under medication during trial without notice to counsel.**

**The petitioner was denied effective assistance of counsel, under U.S. CONST. Amend. VI, because she was placed under medication during trial without notice to counsel.**

On direct appeal the petitioner complained that she was placed under medication while in custody during her trial.  The evidence showed that the petitioner, while an inmate of the Harris County jail, received medication which could affect her level of awareness during the time she was on trial. According to the testimony of both defense attorneys at trial, during voir dire the petitioner fell asleep and was not communicative with counsel.  She continued to be groggy and not communicative in the early days of trial.

In the middle of trial a competency hearing was ordered.  Only when psychologist Walter Quijano examined the petitioner was it discovered by defense counsel that in June, 1999, shortly before voir dire began, jail medical staff began

giving the petitioner anti-psychotic drugs, Zoloft and Trazadone (RR XXXVIII-75). A physician testified that Trazadone could have made the petitioner sleepy and dizzy (RR XXXVIII-110). The petitioner testified that the drugs made her drowsy and she could not remember things when taking the drugs (RR XXXVIII-19).

This medication was administered with no notice to defense counsel. Both attorneys testified that they did not know about it before the revelation by Dr. Quijano (RR XXXVIII- 45-46, 72). The responsible jail official admitted that she did not advise counsel or the judge (RR XXXIX-36). Defense counsel went through part of the trial without realizing why they could not communicate effectively with their client. According to lead counsel Leitner, the original strategy had included having the petitioner take the stand, but that had to be abandoned because the petitioner did not seem to be mentally present during early phases of the testimony (RR XXXVIII-82, 84).[5] This also undermined counsel's opening statement (RR XXXVIII-89). Furthermore, the petitioner's medication-induced appearance (including a blank expression and, at times, sleeping) might have conveyed a false impression that the petitioner was callous and indifferent.

---

[5] In Texas a defendant who takes the stand must answer all questions. The petitioner would have been cut to ribbons on cross-examination if she had been asked about State's witnesses' testimony which she did not comprehend – or perhaps not even hear – because she was medicated.

The petitioner assumes that someone in the jail thought the medication was helpful, and there was not a deliberate attempt to undermine the petitioner's chances at trial by medicating her.  Where the bad faith arose was in the failure of any state official – either from the jail or the prosecutor's office – to notify defense counsel that the petitioner was being medicated.

The Court of Criminal Appeals' opinion recognized three different claims in the direct-appeal brief:

> The appellant argues that the "State's secretive medicating" of her violated (1) her right to due process under the Fifth and Fourteenth amendments to the United States Constitution, (2) her right to demonstrate her true mental state to the jury, and (3) her right to effective representation by counsel, as she was unable to communicate effectively with her attorneys during trial.

The petitioner relied on *Riggins v. Nevada*, 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992).  In that case Riggins was medicated over counsel's objection, while here the petitioners' attorneys were kept in the dark for much of the trial. Thus, while Riggins is not factually identical, such as to activate the "contrary to" prong of Section 2254, the issue here is sufficiently similar to make the decision in this cause an "application" of  *Riggins* – and more specifically, an objectively unreasonable application.  The Court of Criminal Appeals' opinion on direct appeal distinguished *Riggins* by holding that *Riggins* only applies to "forcible" involuntary medication, and the record in this cause showed that the medicine was administered to the

14

petitioner "only after advising the [petitioner] of the recommended treatment and receiving the [petitioner's] consent." The Court of Criminal Appeals missed the most important point.

The medication was called "forced" in *Riggins* because it was done over a defense objection which was raised in a pretrial motion. Here the medication was given behind counsel's back, using the petitioner's acquiescence as justification even though the petitioner was at the mercy of her jailers and was not in a traditional doctor-patient relationship. This is much worse than what happened in *Riggins*, because counsel was not able to (a) object to the medication, or (b) adjust the defense trial strategy to take account of the effect of medication. If the medicine was likely to affect the petitioner's presence of mind and appearance during trial, no medicine should have been given – especially by a state actor – without notice to counsel and a chance for the petitioner and her counsel to consider the likely effect on the trial.

The Court of Criminal Appeals' application of *Riggins* was the last reasoned analysis of the merits.  On habeas review the state court simply held that the *Riggins* claim had been raised and rejected on direct appeal.  The question then becomes whether the application of *Riggins* by the Court of Criminal Appeals was unreasonable.  If so, relief should be granted, on guilt as well as punishment. For purposes of 28 U.S.C. §2254, the petitioner believes three distinct claims are cognizable: (1) the "right to put on a complete defense," including the right to take

15

the stand and testify, (2) the right to be tried without an appearance to the jury which would be prejudicial, and (3) the right to assist her attorneys in the course of the trial (including voir dire, the guilt phase, and punishment).[6]

The "complete defense" concept, as a component of Fourteenth Amendment due process, developed in a series of cases including *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142, 90 L.Ed.2d 636 (1986), *Chambers v. Mississippi*, 410 U.S. 283, 93 S.Ct. 1038, 90 L.Ed.2d 636 (1973), and *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). The right to testify clearly falls within the scope of this concept. According to lead defense counsel Leitner, defense counsel planned to have the petitioner testify.[7] The petitioner's zombie-like condition, imposed by State actors during trial, made it effectively impossible for the petitioner to testify, not merely because of the bad impression she might make, but also because she may not have been able to follow the State's testimony closely enough to avoid missteps that an alert observer might have avoided.

A criminal defendant has a right to be in the courtroom, which necessarily

---

[6] Another possible approach would be the "right to be present" as a component of the right of confrontation, but that argument was not urged as a separate constitutional violation in the state courts, and the petitioner therefore will ask this Court only to consider confrontation as a component of harm analysis.

[7] The wisdom of having the petitioner testify can be understood by considering the testimony of Hope Ahrens, discussed in Claim Seven. At the very least, some refutation of what Ahrens said about the petitioner making death threats to other people would have been useful, and no one but the petitioner was really in a position to provide such refutation.

means that the jury will be able to see the defendant. *Taylor v. United States*, 414 U.S. 17, 94 S.Ct. 194, 38 L.Ed.2d 174 (1973).  The right to be present is supposed to be an asset to a defendant, not a liability, but in this case there was a substantial risk that the petitioner's appearance could work against her.  Some juror, seeing the petitioner in a stupor, might think she was being sedated as a method of control. Of course the medication also could have made the petitioner seem indifferent to these very serious proceedings. The Supreme Court has not directly addressed whether causing a defendant to appear in a stupor during trial also is unconstitutionally prejudicial, but that would be the only reasonable conclusion to draw.  In a death-penalty case, if the defendant does not even appear to be interested in and paying attention to the proceedings, there is a risk that some juror may think "If she doesn't care that she could be executed, why should I?"  This would be a subtle effect, impossible to gauge for harm reliably.

Third, with the petitioner mentally "out to lunch" during the State's evidence against her, she was being denied the full scope of her right to confront the witnesses against her.  In *Illinois v. Allen*, 397 U.S. 337,344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970), where the defendant was physically restrained in court due to unruliness, the Court observed that "one of the defendant's primary advantages of being present at the trial" is "his ability to communicate with counsel." *Allen* permitted the restraint of a defendant in order to maintain courtroom decorum. In the petitioner's case,

however, there was no evidence that the medication actually was necessary.  On the other hand, the impact on the right of confrontation was great. The petitioner, if alert, would have been able to advise counsel, as the evidence unfolded, whether she knew particular testimony to be false or inaccurate.  This function would be especially important in a trial like this one, where the State was relying in part on accomplice testimony by someone whom the petitioner knew.

### ARGUMENT SUPPORTING CLAIMS FOUR AND FIVE

**The petitioner was denied due process of law under U.S. CONST. Amend. XIV when the trial court granted only a one-day continuance in response to belated revelation of potentially exculpatory material.**

**The petitioner was denied due process of law under U.S. CONST. Amend. XIV when the State failed to reveal potentially exculpatory material regarding the conduct of the Galena Park Police Department.**

Another pair of issues affecting the guilt stage of trial concerned the inadequate remedy provided for a failure of the State to produce potentially exculpatory material in a timely manner, *i.e.* soon enough to really do the defense some good.   This particularly concerned potential impeachment evidence with respect to the Galena Park Police Department, the agency which conducted the investigation.  Despite the granting of a pretrial discovery motion (State CR-45), the State failed to inform defense counsel in a timely manner of potentially exculpatory information from Floyd Sanson, a Galena Park officer who had been discharged two days after he went to the

18

District Attorney's public integrity unit to report irregularities in the investigation of this crime (RR XXII-99).

As early as May 3, 1999 Sanson had told the District Attorney's Office that he believed officers had lied in the trial of a codefendant, James "J.D." O'Malley, which preceded the petitioner's trial (RR XXI-46). Sanson's communication to the District Attorney's Office was not revealed to the petitioner's counsel when it occurred. Defense counsel had a belated opportunity to interview Sanson on the eve of trial, and at that time he told defense counsel *inter alia* that there were tape-recordings of the interrogation of O'Malley, which had not been disclosed to defense counsel. Sanson also reported to counsel that there was a more complete internal "arrest log" record, which also had not been disclosed. Sanson also said that the failure of some important participating officers to make offense reports was not in keeping with Galena Park police practice. He also revealed that one of the investigating officers was trying to make a high-profile case because he was seeking an executive job in another law enforcement agency.

*Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny require prompt disclosure of exculpatory evidence. For *Brady* purposes, impeaching evidence is considered a form of exculpatory evidence. The prosecutor in this case claimed that she believed referral of Sanson to a specialized bureau of the District Attorney's Office satisfied the requirements of *Brady* (RR XXI-8). That is an

absurd position, since discovery means production to the opposing party, not to another branch of the prosecutor's own office.

Defense counsel asked the district court judge for a continuance in order to be able to conduct a further investigation based on the belated discovery.  The trial court granted only a one-day continuance, which was virtually useless.  With only one day to work, defense counsel could not possibly do the follow-up investigation which was needed.  That investigation would have included – at a minimum – having the defense investigator (or one of the defense attorneys) interview Galena Park officers about regular practices and how the investigation in this case deviated from those practices.

The Court of Criminal Appeals held that the State's failure to reveal irregularities in the interrogation of O'Malley was not prejudicial because what O'Malley had to say was not material to the petitioner's defense.  On its face that seems objectively unreasonable, given that O'Malley not only inflicted some of the beating on Musso, but was supposedly was the petitioner's "enforcer" to keep the other people in line when the petitioner was absent (if Hope Ahrens is to be believed).  Furthermore, Chief Pruett testified that O'Malley confessed to the crime (RR XXV-25).While an objection was sustained and the jury was instructed to disregard this, the fact that the chief would even reveal that suggests that the police viewed O'Malley's statements as evidence against the petitioner.

There is good reason to believe the police took unfair advantage of O'Malley.

A major question was whether O'Malley, who was slightly retarded, had been induced to cooperate when the police "deputized" him. A former dispatcher for the Galena Park Police Department and a police lieutenant both testified about hearing of this ruse (RR XXI- 96, 117). Yet it was not included in any official reports. Of course it would have been ludicrous to actually make O'Malley a peace officer, but a retarded person facing charges himself might be easily gulled. Two officers testified that O'Malley actually fell for it and believed he had been deputized as a peace officer (RR XXII- 11, 20).

Sanson had been asked to resign, in lieu of being discharged, on orders of the Galena Park police chief (RR XXI- 88, 105). The question was whether Sanson was pushed out because he knew of irregularities in the investigation, including the bogus "deputization." Sanson said both Chief McDonald and Chief Pruett refused to answer any questions Sanson had about it (RR XXI- 69-70). Sanson said other officers feared for their jobs, and guessed that was the reason why they did not mention it (RR XXII- 77-78). He said prosecutors had told him that it was not a "big deal." Sanson also said he heard Chief Pruett say that there were audio tapes which had not been produced, but Sanson's knowledge was limited, as he was fired two days after that conversation (RR XXII-99).

Clearly there were still more questions than answers. Without having the answers, how could the Court of Criminal Appeals really know how material this

issue was?  Furthermore, would not the tapes be important in getting to the truth about this matter?  As to the paucity of offense reports, a matter not even mentioned by the Court of Criminal Appeals, that potentially affected all of the codefendants. This Court could find that the Court of Criminal Appeals' analysis was objectively unreasonable simply because that court really just assumed a lack of relevance and thus a lack of harm.  What is most important, however, is that *Brady*-compliant discovery is not important merely for the substance of the evidence disclosed, but also because that evidence can lead to further investigation. The Court of Criminal Appeals' application of *Brady* doctrine was objectively unreasonable.

Even worse, however, is that the Court of Criminal Appeals treated the denial of a meaningful continuance as just a tail on the *Brady* dog.  In reality the denial of an adequate continuance was a major constitutional error. *Ungar v. Sarafite*, 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964), as quoted in *Rosales v. State*, 841 S.W.2d 368, 374 (Tex. Crim. App. 1992), established that denial of a continuance can be a violation of due process:

> [The granting of a continuance] is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel. Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality.

The need to deal with a *Brady* violation makes delay in trial "justifiable" because it

is impossible to know, at the moment when discovery is belated provided, just what

defense counsel might find in response to the disclosure of impeaching material.

Defense counsel needs to know that *before* trial begins, in order to know how big an

issue the credibility of State's witnesses will be and how much voir dire time and

effort to spend on that credibility issue.  Part of the need also is knowing precisely

what defense witnesses might be called, as it may be necessary to determine whether

potential jurors know those witnesses.

Nowhere is the need for adequate time to prepare greater than in death penalty

cases.  A concurring opinion in *Furman v. Georgia*, 408 U.S. 238, 306, 92 S.Ct. 2726,

2760, 33 L.Ed.2d 346(1972) observed: "The penalty of death differs from all other

forms of criminal punishment, not in degree but in kind.  It is unique in its total

irrevocability." It follows that a continuance is likely to be more important in a death-

penalty case than in any other kind of case.  Since the Court of Criminal Appeals'

analysis simply brushed off the continuance issue, it was an unreasonable application

of the Supreme Court's *Ungar* decision.

## WAIVER OF CLAIM SIX

**The trial court erred in denying the motion to quash with respect to
purported remuneration, in violation of U.S. CONST. Amends. V
and VI, applicable via U.S. CONST. Amend. XIV.**

The petitioner waives this claim.

## ARGUMENT SUPPORTING CLAIM SEVEN

**The petitioner was denied the effective assistance of counsel on the issue of guilt, in violation of U.S. CONST. Amend. VI, because counsel failed to object to the jury charge on the grounds that Hope Ahrens was not named as an accomplice witness.**

The petitioner argued in an amended motion for new trial and on direct appeal (Point of Error Ten) that trial counsel was ineffective at trial for failing to object to the jury charge on the basis of the failure of the charge to name Hope Ahrens as an accomplice witness and the failure of the charge to instruct on the evidentiary rules which should apply to Ahrens' testimony because she was an accomplice witnesses. This was a bit unusual in that the lead trial attorney was also counsel on direct appeal (and obviously on the motion for new trial). Considering the circumstances, however, this was not the legal equivalent of Sonny Liston "taking a dive." Counsel gave a credible explanation that there had simply been a serious mistake.

Ineffective assistance claims are evaluated under a two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, the petitioner must show that trial counsel's performance was "deficient" as measured against professional norms. This first prong is the equivalent of a determination of error. The second prong of *Strickland* requires that the appellant show that the deficient performance was prejudicial, which is the equivalent of a showing of harm. *Strickland* calls for reversal if there is a "reasonable probability"

24

that, but for counsel's unprofessional representation, the result would have been different.  This actually means a probability sufficient to "undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. While reviewing courts usually compartmentalize the *Strickland* analysis into two parts, *Strickland* itself cautions that it is important to keep an eye on the "big picture." An oft-overlooked passage from *Strickland, supra* at 696, 104 S.Ct. at 2069 commented:

> In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial system that our system counts on to produce just results.

In the end, what matters is whether defense counsel functioned as an effective adversary to the prosecution.

The first question thus is whether professionally competent counsel would have objected to the lack of an accomplice witness instruction regarding Ahrens.  Under Texas statutory law, conviction may not rest upon the uncorroborated testimony of an accomplice witness, and corroboration must do more than show the commission of the offense. TEX. CODE CRIM. PROC. Art. 38.14. Furthermore, one accomplice may not provide the corroboration for another. It is proper to instruct a jury that if one witness is an accomplice as a matter of law, the jury should consider whether the facts show some other witness to be an accomplice. *Aston v. State*, 656 S.W.2d 453 (Tex. Crim. App. 1983).

Hope Ahrens was charged with the same crime as the petitioner, and she had been tried before the petitioner was tried, although that trial resulted in a mistrial. Thus Ahrens was an accomplice witness as a matter of law. Furthermore, Ahrens' testimony bore out that view that she was an accomplice in the abuse of Musso. As one might expect, however, she minimized her own role while emphasizing that of the petitioner. In fact, Ahrens tried to portray herself as a sort of victim of the petitioner.

Ahrens said in August, 1998 she was living in an apartment with her mother, her brother, and her fiancé, Terence Singleton. The petitioner and J.D. O'Malley brought Musso to the apartment when they visited (RR XXXI-20). The petitioner and Musso were supposed to get married (RR XXXI-21). One evening when the petitioner brought Musso to the apartment, Musso "was beaten up," having two black eyes (RR XXXI-25). Musso said he had been beaten up by strangers (RR XXXI-25). The petitioner ordered Musso to stay on a mat, which at different times was on a couch and in the hallway (RR XXXI- 26-27). Musso would be sitting up on his knees or on his hands and knees (RR XXXI-28). It also was odd that Musso was wearing pants that were too big for him and kept falling off (RR XXXI-30).

Regarding the weekend preceding Musso's death, Ahrens said Musso had black eyes and some scratches when he arrived (RR XXXI-33). Musso said he wanted to go outside and run, and O'Malley and Singleton had him outside, making

26

him run, until a policeman brought Musso back to the apartment (RR XXXI- 34, 36).

At some time after that, Ahrens said, the petitioner slapped Musso and was angry

because "the cops came" (RR XXXI-39).  J.D. O'Malley kicked Musso repeatedly,

Ahrens said, while the petitioner urged O'Malley to "keep kicking him" (RR XXXI-

40).  O'Malley tired of it and took off his boots.  Ahrens claimed she had "told them

to stop" and that she tried to hide the boots (RR XXXI-41).  Ahrens claimed that she

tried to put some peroxide on Musso's wounds (RR XXXI-41).

Ahrens further stated that the petitioner used a baseball bat to beat Musso,

although she could not remember what day that actually happened (RR XXXI- 42.

49).  She said Musso sometimes wet himself while staying on the mat and that the

petitioner did not always have fresh clothes for him (RR XXXI-44).  Also without

being specific as to dates, Ahrens said the petitioner would leave the apartment and

place O'Malley in charge, telling O'Malley "to watch us, make sure we don't go

outside or use the phone" (RR XXXI-45).  O'Malley would not let Musso get off the

mat, and he hit Musso when Musso tried to move (RR XXXI- 46-47).

After describing in detail how the petitioner beat Musso with a baseball bat,

Ahrens admitted that she hit Musso with a wooden bird (RR XXXI-54).  She did that,

she claimed, because Musso broke a ceramic Mickey Mouse ornament that Ahrens

had (RR XXXI- 54, 56-57).  Ahrens claimed she "loved Mickey Mouse," as if she

were a little child rather than an adult.  Later her story mutated and she said the

27

petitioner had struck Musso with the wooden bird two days earlier (RR XXXI-61).

Ahens said Musso asked the petitioner to call an ambulance so he could go to the hospital, but she refused (RR XXXI-59). Again Ahrens was not specific as to when that occurred. Ahrens said she thought Musso needed an ambulance, because Musso was "moving very slow and like he was in pain," but she did not call for one (RR XXXI- 59-60). Ahrens claimed that she fed Musso while he sat on the mat (RR XXXI-61). Although there was a telephone in the apartment, Ahrens said she did not use it because the petitioner had ordered J.D. O'Malley to "hit us or kick us" (RR XXXI-63) – even though Ahrens admitted that Terence was bigger than O'Malley, such that a team of Ahrens, her brother, and Singleton easily could have beaten O'Malley in a fight. Ahrens even admitted that there was a gun in the apartment that she could have picked up, but she did not do that "'cause I'm scared of guns" (RR XXXI-65). Ahrens said the petitioner had threatened to kill anyone who disobeyed her (RR XXXI-65). Ahrens claimed to have been asleep when Musso died (RR XXXI-67). Defense counsel, by failing to object, allowed Ahrens to get away with stating her opinion as to the cause of death:

Q [Prosecutor]. Did you know what caused him to die?

A. I believe all the beating.

(RR XXXI-67). Notwithstanding the medical examiner's precise testimony, Ahrens planted the idea in the jurors' minds that even the beatings purportedly inflicted by

28

the petitioner contributed to Musso's death.

On cross-examination defense counsel tried to show that Ahrens had her own reasons for animosity toward Musso. Musso had hit two children who were in the apartment for babysitting, and Musso got angry and said he wanted Hope and her mother, Berniece Ahrens, to die (RR XXXI-105). Ahrens also admitted that the petitioner was not at the apartment when Musso actually was killed (RR XXXI-134).

During closing argument the petitioner's counsel challenged Ahrens' credibility, but because Ahrens was not named as an accomplice witness in the jury charge, defense counsel could not argue that Ahrens had to be corroborated under Texas law. Such an argument surely would have included the point that merely showing an offense was committed, *i.e.* that someone beat Musso up, would not be sufficient corroboration. An argument that Ahrens had to be corroborated would have been a far more potent argument than the simple attack on her credibility. Jurors might or might not have viewed Ahrens the same way that defense counsel did, but they would have had to face the fact that anyone in a position to back up Ahrens' testimony against the petitioner would also be an accomplice.

Defense counsel stated in the motion for new trial that there was no "strategy" of declining to ask for an accomplice-witness instruction (CR IE-1494). There is no evidence to contradict counsel's admission. The failure to request such an instruction established the first prong of *Strickland*.

29

The Court of Criminal Appeals rested its analysis on the second prong of *Strickland*, holding that there was adequate corroboration, in particular the petitioner's second statement to the Galena Park police (SX-69). In that statement, however, the petitioner admitted striking Musso on a different occasion and admitted helping dispose of Musso's corpse. The petitioner did not admit even being present for most of what Ahrens described, much less admit dishing out any of the violence inflicted on Musso (RR XXV- 4-13).

The Court of Criminal Appeals also postulated that evidence of motive was corroborative. How could that be when Ahrens did not testify about motive? Furthermore, that analysis missed the point that this was an ineffective assistance claim, not a sufficiency claim. The Court of Criminal Appeals was simply guessing that the jury would have seen mere motive as corroborative. The test under *Strickland*, *i.e.* undermining confidence in the outcome, does not mean the petitioner had to prove that there was no possible theory under which a jury could have found corroboration. That would convert the *Strickland* test into a burden upon appellants to prove harm beyond a reasonable doubt.

Furthermore, the Court of Criminal Appeals did not actually use the *Strickland* second prong, but instead superimposed a different harm standard, used under Texas law for jury charge error, on the ineffective assistance issue. Since the second prong of *Strickland* is clearly articulated, and the Texas charge-error harm standard is not

30

the same as the *Strickland* test, the Court of Criminal Appeals' *Strickland* analysis was an unreasonable application of that case.

## B.

## ISSUES AFFECTING COMPETENCY HEARING

In the middle of trial defense counsel requested a hearing on the petitioner's competency to stand trial, as counsel had found the petitioner to be giving "off the wall" responses when counsel talked to her (CR I-E-1420). While that may have been largely due to the secret medicating of the petitioner, neither the attorneys nor the court was aware of that.  The judge reluctantly authorized a separate jury trial on competency, conducted mid-trial. Two federal constitutional issues pertain to the competency trial.

## ARGUMENT SUPPORTING CLAIM EIGHT

**The petitioner was denied the effective assistance of counsel on the issue of competency, in violation of U.S. CONST. Amend. VI, because significant background information which supported defense expert Quijano and undermined State's expert Brown was not presented.**

The competency trial, as is often the case, was a battle between experts.  The State's position leaned heavily on psychologist Jerome Brown, who examined the petitioner in the judge's chambers during the middle of trial and concluded that the

petitioner was malingering (RR XXVIII- 9-17).[8] The keystone of the defense case was the testimony of psychologist Walter Quijano, who also examined the petitioner.

While part of Brown's opinion was based on discrepancies in the petitioner's presentation in the examination, Brown also expressed doubt about the substance of the petitioner's belief that she was "Suzanne Burns," a teenager at the St Anne's Institute in Albany, New York, placed there because her mother was mean to her.  At one point he referred to the "so called" institute (RR XXVIII-16).  If defense counsel had conducted adequate pretrial investigation, counsel would have been aware that the petitioner's name as a child was Suzanne Burns, and when she was a teenager she was placed at the St. Anne's Institute in Albany.  See the discussion of Claims Ten and Eleven. The petitioner was placed at St. Anne's Institute because of juvenile delinquency, but adequate pretrial investigation would have shown that the petitioner had been abused by her mother. In other words, the petitioner was not making up either her stay at St. Anne's or the abuse, but she was erroneously linking the two. That seems more like a confused mind than a calculated deception.  In short, if defense counsel had been armed with the available true information, he could have made Brown eat his sarcastic words.  Deflating Brown's balloon might have been

---

[8]  The trial court judge did not allow the defense to ask Brown whether he thought the petitioner had a factitious disorder, *i.e.* a condition which causes a person to chronically says things that are not true (RR XXVIII-27).  In other words, Brown was allowed to imply that the petitioner faked her condition in court deliberately but could not be cross-examined as to a condition which might lead to faking and lying.

enough to change the result.

Adequate investigation might have bolstered Quijano as well. Quijano believed the petitioner was incompetent due to a smorgasbord of psychiatric disorders, including possible posttraumatic stress disorder. Proper pretrial investigation into the petitioner's background would have revealed ample events in the petitioner's childhood which could contribute to such disorders. This evidence is fully discussed in Claim Ten, but much of it could have been used to bolster Quijano.

As will be discussed in the punishment section below, pretrial investigation is a fundamental component of effective assistance in a Capital Murder case. In this case the harm from the lack of adequate mitigation investigation spilled over into the competency proceedings as well, to a degree sufficient to undermine confidence in the outcome of the competency trial (which is the test under the second prong of *Strickland*).

### ARGUMENT SUPPORTING CLAIM NINE

**The petitioner was denied effective assistance of counsel on the issue of competency, in violation of U.S. CONST. Amend. VI, because counsel provided information used against the petitioner at the competency trial.**

As part of Jerome Brown's evaluation, Brown questioned the two defense attorneys about their contacts with the petitioner. Brown quoted second-chair counsel

Donahue as stating that he "had no real trouble communicating with her and was able to obtain her version of the circumstances leading to her arrest in a satisfactory fashion" (CRI-E-1420). That, of course, was adverse to a finding of incompetency, and thus Donahue was placed in the position of giving evidence against his client, based on communications which were supposed to be protected by confidentiality. TEX. R. EVID. 503. Brown quoted lead counsel Leitner as saying "he had no difficulties communicating with her until the day before this examination took place when he found that her responses to him were 'off the wall'" (CR I-E-1420). Again, the substance of what Leitner revealed was supposed to be privileged.  The state habeas court generally stated that the petitioner had failed to demonstrate "deficient performance" (the first *Strickland* prong), which is not merely "objectively unreasonable."  For a district court to find no problem with defense attorneys presenting evidence against their client in a Capital Murder case is little short of incredible.

The attorneys themselves did not create the whole problem.  To be fair to them, the blame really lies with (a) Dr. Brown and (b) the prosecutors.  Why Brown was doing a mid-trial evaluation really was not relevant, and hence the attorneys' opinions about the petitioner's pretrial competency was not relevant.  That information was only relevant to the hypothesis that the petitioner started malingering when she saw the case building against her.  Brown's consultation with the attorneys could have

been kept out of the substantive report, or the prosecutors could have redacted it prior to producing Brown's report as competency evidence.  In the end it was the State's use of the defense attorneys' disclosures, rather than the mere disclosures themselves, which really did the damage, but the defense attorneys share the blame for making the disclosure to Brown in the first place, especially since they had to know that Brown was not their ally.

As suggested above, the statements attributed to counsel were potentially very damaging to the petitioner, as they could be taken as evidence that the petitioner started to fake mental illness when she saw the tide turning against her. There was no way to take the sting out of this part of Brown's evaluation, as Brown could not effectively be cross-examined by the very same attorneys he was quoting. *Strickland, supra* at 696, 104 S.Ct. at 2069 commented:

> In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial system that our system counts on to produce just results.

Permitting defense counsel to provide evidence against the client at the competency hearing in a Capital Murder case is a "breakdown in the adversarial system."

The state habeas court accepted the State's proposed finding that "similar information was before the jury during the competency hearing through the psychological evaluation report and testimony of defense expert Walter Quijano"

35

(St.Hab-250). In other words, the trial court jumped to a conclusion that any error was harmless.  The state habeas court failed to appreciate that this was a form of conflict between the petitioner and her counsel, not just a strategic error or omission by counsel, and it was a conflict which easily could have been avoided.   It would have been avoided if the State had not exploited it by offering defense counsel's opinions, via Brown, as evidence against the petitioner.  It also might have been avoided if defense counsel had objected when it was offered, but counsel did not object. The circumstances are such that this Court cannot have confidence that the outcome of the competency hearing would have been the same if the jury had not been told that the petitioner's own lawyers thought she was competent a few days earlier.

## C.  ISSUES AFFECTING PUNISHMENT

Several constitutional issues pertain to the punishment stage of trial.  In addressing these, it should be remembered that multiple errors may have had a cumulative effect on the jury's special-issue determinations.

### ARGUMENT SUPPORTING CLAIMS TEN AND ELEVEN

**The petitioner was denied the effective assistance of counsel at the punishment stage of trial, in violation of U.S. CONST. Amend. VI, when counsel failed to present mitigating evidence, largely because of inadequate investigation, and secondarily because of the petitioner's mental condition.**

**The petitioner was denied due process of law under U.S. CONST. Amend. XIV when the trial court refused to fund a mitigation expert.**

The next two issues will be presented together, in that they share a common theme: inadequate pretrial investigation of mitigation evidence.  A vast amount of potentially mitigating evidence was not presented at the punishment stage of trial. This was mostly defense counsel's fault, but not entirely.  The petitioner's counsel failed to independently investigate the petitioner's childhood, instead relying on a smattering of information provided by the petitioner's sister. Trial counsel did not go to New York State or send an investigator to New York State in order to conduct the needed investigation. Ultimately the blame for inadequate investigation falls upon defense counsel, but in this case the trial court deserves a large measure of blame for thwarting the defense investigation by denying necessary funding.  Even with a late

37

start, it would have been possible for a defense investigator who really hustled to assemble most of the evidence which will be discussed below in the time remaining before the punishment stage was reached.

### (A) The Constitutional Obligation of Counsel to Conduct a Thorough Mitigation Investigation

Constitutional case law, starting with Supreme Court cases decided well before the petitioner's trial, has come to place particular emphasis on pretrial preparation as a part of the effective representation required by the Sixth Amendment.  While this is sometimes viewed as a modern phenomenon, its roots go at least back to the 1930's, as the Texas Court of Criminal Appeals recognized over a decade before the petitioner's trial in *Ex parte Duffy*, 607 S.W.2d 507, 516 (Tex. Crim. App. 1980):

> A criminal defense lawyer must have a firm command of the facts of the case as well as the governing law *before* he can render reasonably effective assistance to his client – in or out of the courtroom [Five citations omitted.] In the seminal decision of *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed.158 (1932), the Supreme Court recognized that a thorough factual investigation is the foundation upon which effective assistance of counsel is built (emphasis added).

*Duffy*, drawing upon *Powell*, observed that "it may not be argued that a given course of conduct was within the realm of trial strategy unless and until the trial attorney has conducted the necessary legal and factual investigation which would enable him to make an informed, rational decision." *Id*. at 520.

As stated earlier, the modern standard for ineffective-assistance claims is the

two-pronged test articulated in *Strickland v. Washington, supra. n,* 466 U.S. 668, 104

S.Ct. 2052, 80 L.Ed.2d 674 (1984).[9]   At least in Texas courts, the first prong of

*Strickland* seems to be applied to trial error in a way which strongly supports trial

counsel out of deference to "strategy," but inadequate preparatory work is a different

story. The Supreme Court stated that counsel must investigate until he reaches a point

that he can make a reasonable judgment that further investigation is not necessary.

*Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066.

The need for pretrial preparation took on greater importance as the Supreme

Court began to recognize the importance of mitigating evidence in a line of capital

cases which included, but was not limited to, *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct.

2954, 57 L.Ed.2d 973 (1978), *Eddings v. Oklahoma*, 455 U.S. 1, 102 S.Ct. 869, 71

L.Ed.2d 1 (1982), and *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d

256 (1989). In *Penry* the Supreme Court stated that "the Eighth Amendment mandates

an individualized assessment of the appropriateness of the death penalty." 492 U.S.

at 317.  More specifically:

> Underlying *Lockett* and *Eddings* is the principle that punishment should
> be directly related to the personal culpability of the criminal defendant.
> If the sentencer is to make an individualized assessment of the
> appropriateness of the death penalty, "evidence about the defendant's
> background and character is relevant because of the belief, long held by
> society, that defendants who commit criminal acts that are attributable

---

[9]   *Strickland* was a habeas case, so the test clearly applies in habeas cases

39

> to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 547, 107 S.Ct. 837, 841, 93 L.Ed.2d 934 (1987).

*Penry, supra* at 319, 109 S.Ct. at 2947. Accordingly, "it is precisely because the punishment should be directed to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense." *Id*. at 327-328. *Penry v. Lynaugh* was concerned with jury instructions which prevented a jury from giving full effect to mitigating evidence. The evil is the same, or perhaps even greater, if the jury simply does not hear the mitigating evidence at all.

Eventually the Supreme Court came to grips with the question of whether inadequate pretrial preparation relating to mitigation evidence constituted ineffective assistance of counsel. In *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct.. 1495, 146 L.Ed.2d 389 (2000) and *Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), the Supreme Court recognized that effective representation in a death-penalty case necessarily included a thorough investigation of mitigating evidence. The Court pointed out a comment in *Strickland* which had remained obscure and under-appreciated: "Prevailing norms of practice as reflected in American Bar Association standards and the like ... are guides to determining what is reasonable." 466 U.S. at 688. In *Wiggins* the Court specifically found that a decision to not

conduct a complete mitigation investigation was unreasonable, citing American Bar Association guidelines calling for "efforts to discover *all reasonably available* mitigating evidence ..." *Wiggins*, 123 S.Ct. at 2537 (emphasis in *Wiggins*). In *Ex parte Gonzalez*, 204 S.W.3d 391 (Tex. Crim. App. 2006), the Court held that, at the time of Gonzalez's trial in 1997, "an objective standard of reasonable performance for defense counsel in a capital case would have required counsel to inquire whether the defendant had been abused as a child." Obviously that also was the standard by the time of the petitioner's 1999 trial, but counsel failed to investigate child abuse, and a lot more.

*Wiggins*, decided in June, 2003, was the last pertinent Supreme Court case which was decided before the conviction became final. Strictly speaking, the issue in this Court must be whether the state habeas court's decision was an unreasonable application of *Powell*, *Strickland*, *Taylor*, and *Wiggins*. Nevertheless, in deciding whether the state habeas decision applied those cases reasonably, other cases applying them may be instructive by analogy. Most instructive of such cases is *Rompilla v. Beard*, 545 U.S. 374, 125 S.Ct. 2456, 2469, 162 L.Ed.2d 360 (2005), where the Supreme Court addressed the question of harm and made it clear that the facts the jury might have heard, as opposed to what it actually heard, is what matters in the end. The true test was whether what mitigation evidence went undiscovered "might well have influenced the jury's appraisal" of Rompilla's personal moral culpability.

41

*Id.*

The state habeas court completely missed the point, and the Court of Criminal Appeals ratified the lower court's blunder, even though *Rompilla* already had been decided when the Court of Criminal Appeals ruled. The state habeas judge's conclusions included a statement that the petitioner did not prove that any of the petitioner's childhood afflictions caused her to have a particular mental condition at the time of the offense.[10] The Supreme Court does not require that degree of proof, however, for the fundamental question is the investigation, the uncovering of the mitigating evidence. The *Rompilla* "might well have influenced" approach is simply an application of the *Strickland* harm standard which has existed since 1984: "undermining confidence in the outcome." The state habeas court's reasoning, and that of the Court of Criminal Appeals, also may have been influenced by a doctrine developed in Court of Criminal Appeals case law, holding that a background factor was not mitigating unless it was shown to have a "nexus" to the charged offense. This belief that a "nexus" was required was incorrect. *Tennard v. Dretke*, 542 U.S.

---

[10]   For what it is worth, habeas counsel sought to have a social worker who specialized in abused women interview the petitioner in prison and see if any specific conclusions could be drawn about the long-term effects of the petitioner being abused as a child, but the habeas judge refused to grant any more time when delays occurred. Even with a more accommodating judge, however, it still would be highly speculative for any interviewer to determine, several years after the offense, what was going on in the petitioner's head at the time of the offense. Getting this kind of information before too much time passes is one of the reasons why a prompt mitigation investigation is important.

274, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004).

This issue also has procedural ramifications, as effective development of mitigation evidence necessitates a special addition to defense resources as well as a particular method of proceeding. Years ago the American Bar Association recommended that the defense team in a Capital Murder case include someone who could investigate mitigating evidence, that is, evidence which might help a jury conclude that a lesser punishment was more appropriate than the death penalty. The State Bar of Texas did not formally adopt this guideline until 2006.[11] Nevertheless, it was a well-established practice to appoint defense investigators in Capital Murder cases, even though those investigators might not be mitigation specialists, for many years before the petitioner's trial. Usually the dispute was about compensation, not the right to have investigative help. See, for example, *Phillips v. State*, 701 S.W.2d 875, 895 (Tex. Crim. App. 1985), *cert. denied* 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 574 (1986), where the denial of a request for more than a statutory allocation of $500 was upheld because Phillips had not shown "some specific need for the funds, such as the need for a particular expert or witness, and in what manner the defendant will be harmed if the funds are not provided." Now that kind of reasoning seems like something from the Dark Ages, yet the petitioner had one of the same

---

[11] The guidelines did not appear in print until the November, 2006 TEXAS BAR JOURNAL even though they were passed by a committee several months earlier.

problems that Phillips had – witnesses in distant parts of the country – but she received no funding specifically dedicated to mitigation investigation.  By the time of the petitioner's trial, there should have been no question as to the constitutional entitlement of an indigent defendant to the assistance of someone with particular expertise in some aspect of the defense.  That is the only reasonable application of *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) to this situation. The Court of Criminal Appeals' comment that the petitioner's "need for expert assistance on mitigation is ... questionable" is outlandish in light of *Ake*.  That Court also commented that the petitioner had access to two other psychologists, apparently referring to the competency hearing witnesses, but it is clear that a Capital Murder defendant is entitled to expert help in preparing a defense before trial, not just in presenting it to a jury.  The Court of Criminal Appeals mined *Ake* for the comment that a defendant is not entitled to an expert "of his personal liking," but the petitioner was entitled to the help of an expert who at least was working for her side, and doing so at the right time.

In light of the foregoing, the correct development of a mitigation case follows this order:

(1)  Hiring a mitigation specialist to guide the research;

(2)  Gathering of background information;

(3)  Determination, based on that information, of what type of expert

could be helpful to the defense;

(4)   Expert evaluations, reported back to counsel;

(5)   Attempts to negotiate a life sentence;  and

(6)   Strategic decisions as to what defensive theories and what witnesses to use.

All of that takes time.  One expert has stated: "Death penalty mitigation is a laborious process that often takes months of work."  Fabian, "Death Penalty Mitigation and the Role of the Forensic Psychologist," 27 LAW & PSYCHOL. REV. 55  (2003).

### (B) Too Little, Too Late

Since the first step is to get a mitigation investigator working, a  defense investigator who could look into mitigating evidence should have been requested months before the petitioner's trial. That did not happen, even though defense counsel had to know that most of the evidence concerning the petitioner's background would come from upper New York State, where the petitioner was raised.  It was not until July 8, 1999 – when voir dire already was beginning – that counsel filed a motion for court-ordered compensation of Mark Cunningham, Ph.D., as a "mitigation expert" in an amount up to $12,500.  The motion maintained that the petitioner "needs an expert [of] the caliber of Dr. Mark D. Cunningham, Ph.D. to have any chance at saving the life of the Defendant herein." *Id*. If counsel knew that, why was the request made so late?  It seems inexcusable.

The trial court denied the motion. The only investigative money approved was

$3000 for an investigator whose efforts were entirely devoted to guilt-related evidence. Not a dime's worth of professional investigative resources went into the investigation of mitigation evidence. With voir dire beginning, neither attorney could take the time to go to New York State (although that probably could have been done at any time after March without running into severe weather problems). With $12,500, Dr. Cunningham might have been able to go to New York State and work full time on this for a week. That would have produced a lot of information the defense team simply missed.

A fair question arises whether July 9 was just too late. That is really three questions. First, could evidence have been found? Even as late as July, a lot of information could have been gathered for presentation at the punishment stage of trial. State habeas counsel, for example, was able to interview people in three different towns in just a few days in July, 2001, and was able to get Schenectady court and school records even though it was the summer.[12] The second question is whether trial counsel could have had the documentary evidence in admissible form, due to pre-filing requirements. If the answer is no, then that adds to the reasons for blaming counsel, since faster action would have made a difference. On the other hand, the

---

[12] The district clerk's office in Schenectady and an attorney for the Schenectady schools were very helpful in obtaining old records very quickly, and they did so cheerfully. The local public defender's office and a Schenectady newspaper reporter also were helpful. Even though there was some dislike for the petitioner's mother among other family members, the petitioner's mother was helpful once habeas counsel was able to find her.

trial court judge might have bent the evidence rules a little bit, rather than have an ineffectiveness issue continuing for years afterward.  The third question is whether the evidence would have been usable by an available expert.  As discussed already, Walter Quijano actually participated in the competency trial and was competent to explain how background factors might relate to some of the psychological disorders which he mentioned. In short, the defense had the man they needed to explain the mitigation evidence which could have been obtained, although as will be seen, some of it really speaks for itself.

Thus the trial court's decision to deny funding for a mitigation investigator was unfair and unreasonable. The Court of Criminal Appeals' response was that the petitioner's need for a mitigation expert was "questionable." On its face, that conclusion was objectively unreasonable, for by the time of the decision in 2003, the Court had to know of the existing *Williams* opinion and should have known that *Wiggins* was percolating in Washington. The Court of Criminal Appeals' position was closer to the view taken in *Phillips* than it was to modern mitigation doctrine as developed in Supreme Court case law.

### C.  The Available Mitigation Evidence

It is now time to review what habeas counsel was able to uncover, using a round-trip Southwest Airlines ticket to Albany, a rented car, public records, and a willingness to talk to the petitioner's family.  Surely counsel's amateur investigation

47

could have been surpassed by a professional mitigation investigator, so what is presented below should be viewed as the minimum mitigation evidence which was available but not discovered by trial counsel.

(1) *Family Background*

The petitioner's story really begins before her birth in the village of Mineville, New York, where a man named Robert Garrow and his wife, Margaret, raised a family under difficult circumstances.  The Garrows were hard workers, but they were harsh parents. This situation was revealed in a book written about one of the Garrow children, Robert, Jr., who became an infamous criminal. That book, *Privileged Information*, was written by Garrow's attorneys, Tom Allibrandi and Frank Armati.[13] See the excerpt in Pet. App. J. As related in the book, Margaret Garrow could be vicious when she was mad.  She knocked out young Robert one time, and he had to be revived by his sister, Florence.  Florence was the petitioner's mother.[14]

Florence married a young man from Ticonderoga, New York named John Burns.  Burns grew up in a large family and was a low academic achiever, finishing seventh grade when he was sixteen (Pet. App. H, Schenectady court psychiatric report on John Burns).  John and Florence Burns moved to Albany, New York, where John

---

[13]  The book is available at South Texas College of Law in Houston.

[14]  Even in 2001, when she was interviewed by state habeas counsel, Florence still had kind feelings toward her brother, who had been deceased for many years by then.  His picture hung next to her door at her home in Schoharie, New York.

drove a truck for a rendering company.  By 1954 the couple had three daughters: Carol Ann (born in 1952), Pauline (born in 1953), and the petitioner (born on May 15, 1954).  They lived in a row house on Third Street in Albany.  It was not a nice house.  Photo Exhibit 1 in Pet. App. M shows Florence Burns and her three daughters on the front door step.  Photo Exhibit 2 shows the three little girls perched atop a space heater.

John Burns got a job in Schenectady, New York, again driving a truck for a rendering company.  The family lived in apartments, including an upstairs, walk-up apartment at 846 Albany Street. That structure, shown in Photo Exhibit 3, is the building next to the former synagogue.  The Burns family continued to grow.  By 1959 there were six children.

(2) *Abusiveness of John Burns*

John Burns was an alcoholic.  The family lived close to Laughing Lou's lounge, where John Burns would hang out and drink before coming home.  Burns' devotion  to his alcohol at time reached absurd extremes, such as one time when he chastised Florence for throwing out a glass of beer which had an insect in it (Pet. App. C, Affidavit of Florence Hotaling).  The petitioner remembers her father as a drunk (Pet. App. F, Affidavit of Suzanne Basso).

The egg hit the fan at Christmas, 1958.  John Burns caroused at Laughing Lou's instead of being home with his family, and when he came to the door Florence

refused to let him in the house (Pet. App. D, Carol Le Roy affidavit).  The police were called, and Florence declared that John was not coming back into the house. A mug shot in the Schenectady County family court records (Pet. App. G, second page) shows that John Burns was processed by the Schenectady Police on December 26, 1958.

Like many alcoholics, John Burns was in denial about his problem.  At a court hearing conducted on February 5, 1959, before Hon. Archibald Wemple, County Judge and Acting Children's Court Judge for Schenectady County, the judge commented that "Your wife has filed this violation alleging that you have been going home drunk and threatening to commit suicide."  Burns retorted: "She would claim I was drunk if I never had a drink" (Pet. App. G, fifth page, Schenectady County court reporter's record).  Both John and Florence were referred to a psychiatrist to be interviewed.

The psychiatrist's report on Florence stated:

Mrs. Burns indicated that she and her husband have six children and he has been giving her $20 a week for the children and "drinks the rest of it." ... She feels that he doesn't like the responsibility of the family.  She resents the fact that he always seems to have enough money for drinking. ... He did belong to A.A. in Albany but he continued to drink even though he went to the meetings and finally the sponsor gave up ...

(Pet. App. H, psychiatric report on Florence Burns).  John Burns, on the other hand, told the psychiatrist that "I don't drink a hell of a lot" and said he only spent four or

five dollars a week on alcohol (Pet. App. H, psychiatric report on John Burns).  The psychiatrist's opinion was that "the two factors which have contributed most to his problem, namely drinking and the lack of religion, are the two identical factors which he brazenly states do not play any role in their difficulties." *Id.*  These public records, which could have been found by trial counsel or by a mitigation investigator (just as they were found by state habeas counsel), established that the petitioner's father was a chronic alcoholic and that his alcoholism was causing deprivation for the family.

The psychiatric interviews revealed additional problems.  John Burns was a domineering person, especially in his sexual demands on Florence.  The birth of six children within seven years is some indication of that, but according to Florence, "several of the children were not wanted" (Pet. App. H, psychiatric report on Florence Burns).  It was not specified whether the petitioner was one of the "unwanted" children.  Beyond that, however, John and Florence may not have done a very good job of concealing their feeling that they had not wanted that many children.

John Burns, for his part, "denie[d] any sexual problems with his wife and indicates that there has been no disharmony" (Pet. App. H, psychiatric report on John Burns).  He also denied assaulting Florence, even though he "received a suspended sentence" for that very crime. *Id.*  The degree to which John Burns' treatment of his wife may have been impressed on the petitioner is difficult to say.  What is not difficult to say is that a cynical attitude toward marriage was a part of the petitioner's

purported role in the crime against Mr. Musso.

Of more importance, however, was the way John Burns treated his children. Florence reported that John "doesn't like to have the children around and is annoyed by toys being on the floor" (Pet. App. H, psychiatric report on Florence Burns). The petitioner, at four years old, undoubtedly was one target of that annoyance, for a four-year-old child inevitably is not going to be careful about putting toys away. The children were kept "shut up in the house all the time." *Id*. John Burns used "extremely crude expressions in front of the children" and was "cruel to the children, whether he's drunk or sober." *Id*. He rarely played with the children. On the contrary, Florence reported, John "likes to make the children squirm and he spanks the oldest boy until he begs for mercy." *Id*. John Burns' view was that "We were brought up strict and that's the way I bring my own children up." Obviously he did not appreciate the  difference between "strict" and "cruel."

Before moving on with the story, the petitioner pauses to note that in the state habeas proceedings, the State argued *inter alia* that the affidavits of various potential witnesses did not indicate that they would have willingly come to Texas to testify. Even if that argument were valid, it obviously would not apply to the Schenectady court documents.[15]

---

[15]  Furthermore, the argument implicitly assumes that there would not have been funds to bring live witnesses from New York State.  The funding, however, would have depended on showing a need, which defense counsel did not do because the most basic investigation was not

John Burns finally left and moved to Syracuse.  Good riddance to him, but he failed to pay child support.  By 1963 he was $11,000 in arrears (Pet. App. G).  In 1963 dollars, that was a lot of money.  Florence Burns was unable to fill the big financial gap.  She could not work outside the house because she had small children. She turned to "welfare" for economic support, and she got food from church food banks.  As Carol Le Roy recalls, the family ate a lot of macaroni and hot dogs, with only one serving per person (Pet. App. D, Carol Ann Le Roy affidavit).

The family also moved frequently, and none of the quarters were nice.  In one apartment the wind would blow right through the wall and make the linoleum on the floor rise (Pet. App. C, Florence  Hotaling affidavit).  In another building, the cellar was infested with rats.  The latter problem brought the family into contact with a city building inspector, Herbert Brooks.

### (3) *Herbert Brooks: A Wolf in Sheep's Clothing*

To a woman on welfare with six children, living in rat-infested housing, city inspector Brooks would seem like a hero.  Here was a man who had more power than the slumlord.  Here was a man who had respect in his community and influence with government.  Here was a man with a steady income and money to spend.  Florence Burns became romantically involved with Brooks and eventually married him.

------

done.

53

Despite his outward respectability, Brooks was an abusive man in private.  His respectability and his position of power may have emboldened him and insulated him from scrutiny.  One form of abuse was his profound cruelty in punishing the children.  Brooks was especially vicious in dealing with the young boys.  He would make them get down on the floor for long periods of time.  A child who looked up was apt to be the target of a swift kick or a flying object (Pet. App. E, Lee Burns affidavit).

With the petitioner having observed this cruel form of punishment, and with Brooks apparently getting away with it, it may be a little easier to understand some of the things which happened to Mr. Musso.  A relative described Musso as being like an eight or nine year old child (RR XXX-66). This childlike person was made to grovel on the floor and not get up for a long time while his tormentors did cruel things to him.  It is reasonable to believe that the petitioner learned this particular type of cruelty from a master, Herbert Brooks.

Brooks punished the petitioner and her two sisters by whipping them with a belt, extension cord, or clothesline (Pet. App. E, Lee Burns affidavit).  Perhaps it pleased him to get his hands on these growing girls.  Eventually he went farther and sexually molested the petitioner (Pet. App. F, petitioner's affidavit).  Today it may be hard to believe that such a thing could occur without being revealed to a teacher or a doctor, but the petitioner did not get regular check-ups (Pet. App. C, Florence Hotaling affidavit).  At that time school personnel were not trained to look for signs

of abuse, as they are now.  There were no social agencies with experts trained to root out such problems.

Due to the unavailability of the petitioner's records from elementary school, there is no way to know if the petitioner, as a child, had reported any abuse by Herbert Brooks.  Further complicating matters is that the petitioner, even as a little girl, was known to fabricate and tell fantastic stories (Pet. App. C, Hotaling affidavit; Pet. App. E, Lee Burns affidavit).  It is possible that the petitioner might have been treated like the proverbial "boy who cried wolf," even though this wolf was real.

The joining of Brooks' existing family with the Burns family also brought the petitioner into contact with Brooks' son, Frederick, who was at the home while he was on leave from the Navy.  According to the petitioner, Frederick Brooks molested her (Pet. Aff. F, petitioner's affidavit). Carol Ann Le Roy confirmed that Frederick Brooks "went behind a closed door" with the petitioner (Pet. App. D, Le Roy affidavit, p. 2).

(4) *Maternal Abuse*

The petitioner's mother also was abusive.  According to Lee Burns' affidavit, Florence was violent when she lost her temper.  That would hardly be surprising, considering the violence which she saw her own mother inflict on Robert Garrow, Jr. and the abused dished out by John Burns and Herbert Brooks.  Lee Burns recalls one time when Florence heaved a gallon jar at Brooks in anger (Pet. App. E, Lee Burns

55

affidavit).

When Herbert Brooks died, Florence again was left to be both mother and father. She violently punished her children, using objects to strike them.  The petitioner indicated that in her affidavit, and it was confirmed by other sources. Florence's sister in law, Beverly Garrow, saw Florence attack one child with a fork, and on another occasion, Florence locked one of the girls out of their home (Pet. App. B, Beverly Garrow affidavit). Lee Burns said his mother once threw a knife at him, and she "had a canoe paddle that she used to hit the boys" (Pet. App. E, Lee Burns affidavit). In a particularly frightening episode, Florence got angry at the petitioner for having cigarettes and literally tried to stuff the cigarettes down the petitioner's throat (Pet. App. D, Le Roy affidavit).

The material provided to the jury contained only the faintest hint of Florence's abusiveness. Buried deep in the petitioner's medical records was a report by the petitioner of "probl. dealing w/ past abuse by mother (RR L, SX P25, next to last page).  The jurors probably would not have even noticed that, since it was not pointed out.

(5) *Abuse by Robert Garrow, Jr.*

Robert Garrow, Jr., the petitioner's uncle, became a notorious criminal.  As described in *Privileged Information*, he became a sexual pervert and raped or molested at least nine females of various ages. His crimes escalated when he killed

four different people, two young men and two young women, who were camping in the Adirondacks. That was according to his own testimony at his trial.

According to the petitioner's affidavit, she was molested by Robert Garrow, Jr. (Pet. App. F, petitioner's affidavit). This was revealed to habeas counsel for the first time on September 6, 2001, when counsel went to the prison in Gatesville to get the petitioner's affidavit, but the "revelation" occurred when habeas counsel, having learned about Robert Garrow, Jr. by going to New York, surprised the petitioner with a direct question about Garrow. That is, the petitioner did not have time to contrive a story before she had to answer "Yes" or "No." Other persons interviewed by habeas counsel have expressed doubt about Garrow molesting the petitioner, and the petitioner does have a history of fabrication, but in counsel's view, two things in particular make the story seem credible. First, the petitioner told counsel about a shack in a park in Schenectady. That squares with the account of another crime committed by Garrow. The petitioner also said she was threatened by Garrow with a snake. That sounds bizarre, but *Privileged Information* recounts how Garrow survived in the woods, while he was being hunted by the police, by catching and eating snakes. Garrow himself is not available to make things clear. He was killed breaking out of a New York penitentiary after his son had smuggled a gun inside by hiding it in a package of fried chicken. In any event, trial counsel had conducted no investigation into this possibility that the petitioner was a victim of Public Enemy

Number One.  Just because the petitioner did not mention Robert Garrow, Jr. did not exonerate counsel from conducting an adequate family history investigation.  *Ex parte Gonzalez, supra*.  Adequate investigation surely would have brought Garrow to counsel's attention, just as he came to habeas counsel's attention.  This was a point on which the petitioner strongly urged the state habeas court to conduct a hearing, but that request was ignored.

(6) *Deliquency and Underperformance at School*

The petitioner attended kindergarten at both Halsey Elementary and Horace Mann Elementary.  School records from that early period are not available.  Florence Hotaling indicated, however, that early on the petitioner had behavior problems.  She stole little things like hair ribbons.  She fought with other children.  She told lies (Pet. App. C, Hotaling affidavit).

Things got worse.  The petitioner showed IQ scores of 97 and 99, but by seventh grade she was doing very poorly in all subjects except Music and Home Economics.  Apart from those subjects, she received four C's, one D, and two F's.  One of the F's was in Physical Education, which is significant. Renvoiz, *Innocence Destroyed: A Study of Child Sexual Abuse* (1993), p. 78 stated that children who are abused often "may avoid physical activities because they are physically sore and uncomfortable from the abuse, or out of fear of having to undress in front of others who, they imagine, might sense their 'dirtiness' or notice physical signs of abuse."

58

Eighth grade netted the petitioner three C's, two D's, and four F's.  On Iowa testing scores, which are graded by percentile ranks, the petitioner ranked no higher than the 66th percentile in anything, and she was as low as the 2nd percentile in one area.  An IQ of 97or 99 should have yielded better results unless some other problems were interfering.

Even more disturbing than the petitioner's low grades was her notable inability to integrate into the school community.  This might have been partly due to her frequent change of schools (six times between kindergarten and ninth grade), but it was not simply a matter of lacking continuity of acquaintances.  Unfortunately some of the records from the eighth grade are cryptic:

> Mother determined not to place Suzanne in Grade 9.  Refused summer school; figured out Girls' Club camp on pseudo-medical recommendation; refused reading help.  Suzanne placed in Grade 9 by Mr. Balcomb with understanding she will repeat 9th at Central Park if she fails to pass course.

(Pet. App. I).  It is not clear whether it was the petitioner, her mother, or both "refusing" remedial steps.  Equally puzzling is the reference to a "pseudo-medical recommendation."  Certainly it would have been useful for counsel to know about any questionable medical claim during the petitioner's childhood, given the State's accusation that the petitioner was a malingerer.  There is a considerable difference between opportunistic malingering, devised for trial purposes, and a factitious disorder repeatedly manifesting itself over time.

On the other hand, some of the teachers' comments from the eighth grade were not cryptic at all in identifying numerous problems the petitioner displayed in school. These included:

Period 1 -- Homeroom -- A loner; will go to any extreme to get attention.

Period 2 -- Physical Education -- Not accepted by peer group – no longer enjoys class – has no "fight back ability" – feeble protests – name calling, ex. "liar."

Period 3 -- English -- fantasy world -- increasingly expresses episodes involving teacher's friend John.  -- Desperately needs a close friend to confide in and emulate.  Needs to bolster confidence and self-concept.  Made fun of by class -- giggly -- interested in boys -- not reciprocated.

Period 4 – Science – Success only with individualized tutoring – appears to make an effort – smiles and breathes.

Period 5 – Mathematics – Periods of uncontrolled laughter over nothing. – Concentration extremely limited.  Desires attention desperately – made fun of by peers.  Relationships with boys tend to be ridiculous.

Period 6 – Social studies – Good attitude – tries to accomplish work.

Period 7 – Home Economics – Needs constant help – Needs help in reading.  Easily led – attention span short.  Few friends – lately becomes more talkative, rather bold – sometimes insolent.

(Pet. App. I, second page).  Some of those comments were so cruel that they say as much about the teachers' shortcomings as the petitioner's shortcomings, but strip away the sarcasm and many troubling signs appear.  Today school counselors, trained to look for signs of problems at home, might have recognized the foregoing conditions as possible symptoms of deeper personal problems.

Early in tenth grade, on October 30, 1969, a request was made by one of the petitioner's teachers for a psychological evaluation. The teacher's comments included:

Excessive absenteeism

Appears very insecure

Fabricates stories

Seems to live in fantasy

Wanders about halls frequently

Appeared in court on her own claims parental abuse

(Pet. App. H, third page). Here at last was some insight into what was happening at home. Unfortunately there is no record of any psychological test other than a Lorge-Thorndike Intelligence Test actually being administered. That test showed an IQ of only 84, a significant decrease from the earlier scores. Even without a professional evaluation of the petitioner's emotional and psychological problems, however, the observations made in the eighth grade and tenth grade comments correspond strongly to known symptoms of child abuse and possible psychiatric problems. Particularly noteworthy is the repeated reference to fabrication and fantasizing. Those observations support the theory that the petitioner suffers from a long-term factitious disorder.

These records would have been just as available to trial counsel, or an

61

investigator, as it was to habeas counsel. They should have become the starting point for development of a mitigation theme. Like the court records, these records are not vulnerable to any argument abut witnesses not saying they would come to Texas. The records are right there for this Court to see, and they would have been available if trial counsel had sought them.

(7) *Exile*

The petitioner and her sister Pauline were placed at a residential facility called the Curley's Home in Delanson, New York. The facility no longer exists, and its successor did not have any of the records. The petitioner then was placed at the Schenectady Children's Home. While she was there, she and a young man named William Bort left the home, found a car, and went joyriding in it. They were soon caught by the police. The family court decided that an increase in the level of supervision was needed, so the court ordered that the petitioner be placed in the residential program at Saint Anne Institute in Albany, New York as a "child in need of closed setting" (Pet. App. K, Saint Anne Institute records).

After she was placed at the institute, the petitioner continued to have low grades in most subjects (Pet. App. K). Her best subject was choral music, perhaps because music is uplifting. Nevertheless, the petitioner continued to suffer some problems. One night she went out of control, "screaming, kicking, pounding [her] head on [the] floor." Four other students carried her to the infirmary, where she was

given thorazine (Pet. App. K, last page).

During this time the petitioner's mother became acquainted with George Hotaling, a man who had a mildly retarded daughter, Brenda. The petitioner and Brenda developed a good rapport. See Photo Exhibit 5 in Pet. App. M. At the petitioner's trial the Stated made much of the fact that some other participants in the crime were mildly retarded, as was Mr. Musso, as if the petitioner's master strategy was to exploit and prey upon retarded people. Because they failed to investigate, defense counsel could not answer that line of argument by showing that the petitioner had been kind to Brenda Hotaling.

(8) *Disastrous Family Life*

The petitioner married early and badly. Her daughter, Mary Ann, testified about child abuse occurring in the family. Although Mary Ann may have overstated the case, the repetition of abuse makes sense in light of what had happened in the two preceding generations.

The petitioner lost custody of her children, but that does not mean she did not want to be a good mother to them. Mary Ann's testimony at trial briefly mentioned that she lived with Carol Ann LeRoy and with Florence Hotaling, but neglected to point out that the petitioner tried to get custody back. The petitioner filed suit in Schenectady, but it was subsequently dismissed. Her background probably worked against her, as did some unwise insinuations that the court was biased (Pet. App. L,

Schenectady County Court Records on Custody Proceedings).

### D.  Counsel's Failure and Its Harm

Based on the foregoing evidence which could have been discovered, the petitioner's trial counsel could have presented several mitigation themes.  Inadequate investigation meant counsel did not have information which could have been put before the jury to show that: (a) the petitioner was raised in poverty in slum housing, (b) the petitioner's natural father was a psychopathic alcoholic who eventually left his family, (c) the petitioner was sexually molested by her stepfather, (d) the petitioner was sexually molested by her stepbrother, (e) the petitioner was molested by her uncle, (f) the petitioner was physically abused by her mother and her stepfather, (g) the petitioner witnessed her brothers being physically abused by her stepfather, in a manner eerily similar to some of the abuse heaped on Mr. Musso by the petitioner and her associates, (h) the petitioner was emotionally disturbed and performed poorly in school, and (I) despite the picture of cruelty toward a retarded person painted at trial, the petitioner had befriended a retarded person when she was young.

All of those factual matters were potentially mitigating. Yet none of them were adequately investigated and therefore were not presented to the jury at trial.[16] In fact,

_____

[16]  It is instructive to compare the areas of mitigation which the petitioner's attorneys missed with the list of investigative topics recommended in Judge Cochran's concurring opinion in *Gonzalez.*  An investigation which followed that list would have turned up most or all of the mitigating evidence discussed earlier.

defense counsel virtually abandoned the mitigation issue, focusing the closing argument at punishment almost entirely on the "future dangerousness" issue.  In *Gonzalez, supra*, the Court of Criminal Appeals reached the conclusion which it also should have reached in this cause: "We cannot say with confidence that the facts of the capital murder and the aggravating evidence originally presented by the State would clearly outweigh the totality of the applicant's mitigating evidence if a jury had the opportunity to evaluate it again."

The analysis really should end with that.  Tempting as it may be to speculate about what effects all of the petitioner's travails had when the crime occurred, many years later, that could be an endless quest, and after *Tennard* it should be unnecessary. While some of the effects of these problems may have carried over to the offense, the Supreme Court repudiated a "nexus" requirement in *Tennard*.  On the other hand, there is an eerie similarity between some of the ways Musso was treated and some of the things the petitioner experienced or witnessed as a child.

The petitioner will go farther, however, and discuss some of the sociological concepts implicated by this evidence.  The broad concept that childhood and teenage disadvantages and victimization may lead to antisocial attitudes and behavior in later years is now almost universally accepted among scholars, and probably among most thinking members of the public. *Penry* doctrine is built on that notion. What is unusual about this case, compared to most Capital Murder cases now before the

courts, is that the petitioner's afflictions occurred before the now-familiar protective

mechanisms became a part of government.  In 1967 the President's Commission on

Law Enforcement and Administration of Justice issued its report, *The Challenge of*

*Crime in a Free Society* (hereinafter "*Challenge of Crime*").  Although social

commentators had recognized the link between sociological problems and

delinquency for years, that report represented a turning point in federal policy, with

official anti-crime policy placing new emphasis on dealing with the sociological roots

of crime.  Today the factors which contribute to criminal behavior are better

understood than in the 1960's, not just because of government attention but also

because of improvements in record-keeping and statistical analysis and strides made

in the fields of psychiatry, medicine, psychology, sociology, and educational theory.

Indeed, many of the negative influences which impacted the petitioner's early life

would be recognized and curbed today by a variety of officials who function as

"advocates" for children in various ways.  By the time the *Challenge of Crime* was

published, however, the petitioner already was thirteen years old, and the personality

which led the petitioner to Death Row was already shaped.

It would require several hundred pages to even summarize all the scholarly

research on the effects of the types of problems the petitioner had.  The petitioner will

just point out a few broad themes.  First, the *Challenge of Crime*, p. 6 observed:

The family is the first and most basic institution in our society for

developing the child's potential, in all its many aspects: Emotional, intellectual, moral, and spiritual, as well as physical and social.  Other influences do not even enter the child's life until after the first few highly formative years.  It is within the family that the child must learn to curb his desires and to accept rules that define the time, place, and circumstances under which highly personal needs may be satisfied in socially acceptable ways.  This early training – management of emotion, confrontation with rules and authority, development of responsiveness to others – has been repeatedly related to the presence or absence of delinquency in later years.

English poet Alexander Pope said the same thing more succinctly: "As the twig is bent, the tree's inclined."  The *Challenge of Crime* report identified several particular negative influences which were statistically correlated with criminal behavior, including (1) absence of a parent, (2) a large number of children, (3) a middle position in the sequence of children, and (4) marital discord between parents.  *Id.*, p. 63.  *All* of these affected the petitioner at one time or another in her early years.  John Burns was off at bars,  drinking away his meager salary, when he should have been at home with his wife and children.  The Christmas Eve episode was just the culmination of a pattern.  Once the inevitable separation occurred, Florence and her children were left to fend for themselves, living in squalor until Brooks entered the scene.  That was scarcely an improvement, however, for it added to the number of children, led to discriminatory treatment in favor of the Brooks children over the Burns children, introduced Brooks' brutally harsh discipline, and, worst of all, placed the petitioner at the mercy of a stepbrother who molested her.

Of particular concern in the *Challenge of Crime* report was the matter of family discipline.  Extreme strictness, the report said, leads to "harboring resentment" rather than a "learning and shaping process." More important than the manner of discipline, however, is the "degree of personal affection or rejection of the child." *Id.* at 64.  The discipline meted out by Herbert Brooks, which the petitioner experienced and witnessed, could only carry a message of rejection.  Personal "affection" was absent. Brooks was a master of cruelty. Those jurors who might have wondered how the petitioner could even stand to see what was done to Buddy Musso might have understood it better if they had known about the methods of Herbert Brooks which the petitioner observed.

Wealth, or rather the lack of it, also is an important factor. In the poorer sections of big cities, such as some of the neighborhoods in Albany and Schenectady where the petitioner lived as a child, the adverse economic climate can aggravate bad conditions within the family.  As one researcher has stated:

> Pervasive poverty and unemployment tend to create a sense of frustration and powerlessness among parents. ... Coupled with the prevalence of large families and heavy child care responsibilities and the absence of adequate health care, day care, and entertainment for children, this negative social climate establishes background for psychological maltreatment.

Garbarino *et al*., *The Psychologically Battered Child* (1986), p. 46.

Last, but not least, is the matter of physical and sexual abuse.  In the *Challenge*

68

*of Crime* report, the terms "child abuse" and "sexual abuse" are not even listed in the index. Since that time, however, there has been a mushrooming awareness of the role of child abuse in shaping the criminal personality. The ways in which this occurs are not entirely understood and will vary between different people. Abuse can lead to more than one psychiatric problem, a condition called "comorbidity." In reality it probably is not possible to prove a direct link, in any given case, between childhood abuse and adult crime, but it is possible to identify empirically significant patterns and observe whether a particular individual's experiences follow that pattern.

A major area of academic interest is the connection between childhood abuse and the disorder called posttraumatic stress disorder, or "PTSD." This condition is believed to afflict many people who commit violent crimes. Charles Scott, M.D. of the University of California, Davis, Division of Forensic Psychiatry wrote:

> Delinquent youth have often been exposed to repeated traumatic events. They have frequently witnessed the killing of friends or family members, seen violence in their neighborhood, or personally experienced victimization. One study found that as many as 30% of incarcerated juveniles met the criteria for posttraumatic stress disorder.

Scott, "Juvenile Violence," 22 THE PSYCHIATRIC CLINICS OF NORTH AMERICA: FORENSIC PSYCHIATRY 71, 75 (March 1999). Juvenile victims of PTSD often display an "I don't care" attitude and "exhibit little empathy for their victims." *Id*. The petitioner was long past being a juvenile at the time of this offense, but she was a juvenile when she fell into a pattern of delinquency and

69

underachievement.  Think of these as early steps on a long road to ruin.

The state habeas court and the Court of Criminal Appeals unreasonably applied the case law doctrine which squarely places the responsibility for mitigation investigation on counsel. Furthermore, the denial of requested funding for mitigation evidence development cannot be squared with *Ake*.  These issues are not really even close.  The only real question should be where to place the blame – on defense counsel, on the court, or on both.

## ARGUMENT SUPPORTING CLAIM TWELVE

**The petitioner was denied a reliable determination of punishment, in violation of U.S. CONST. Amends. VIII and XIV, because significant mitigation evidence was not presented.**

As an alternative to blaming defense counsel, the state habeas court was asked to hold that the amount of mitigating evidence not presented was so significant that the petitioner did not receive a reliable determination of her personal moral culpability, which is supposed to guide the death-penalty decision. The same facts presented with respect to Grounds Ten and Eleven are applicable here as well.  The difference is that, apart from whether counsel was to blame, the trial did not satisfy the Eighth Amendment's requirement of a greater degree of accuracy and reliability in death-penalty cases than in non-death cases. *Gilmore v. Taylor*, 508 U.S. 333, 342, 113 S.Ct. 2112, 2117, 124 L.Ed.2d 306 (1993).  *Gilmore* cited *Herrera v. Collins*, 506 U.S. 390, 399, 113 S.Ct. 853, 860, 122 L.Ed.2d 203 (1993), which actually used

70

the term "additional protections" when referring to the Eighth Amendment's heightened reliability requirement. That is significant because processes such as pretrial investigation and the providing of experts would be classified as "protections." In the interest of protecting the lawyers and the state court, this Court should consider using this claim as an alternative vehicle for relief.

## ARGUMENT SUPPORTING CLAIM THIRTEEN

**The petitioner was denied the effective assistance of counsel on the issue of guilt, in violation of U.S. CONST. Amend. VI, because counsel did not request a particular specialist on nerve damage.**

In conjunction with the ineffectiveness issue in Ground Ten, this Court also should consider the claim that counsel was ineffective for not asking to court to fund an expert to assist the defense, namely a physician specializing in nerve damage. That issue was rejected on direct appeal. Two experts testified at the motion for new trial, finding that the petitioner in fact had nerve damage in both legs (RR XXXIX-48, 56, 90, 96). This would have been important because the State implied to the jury that the petitioner was faking her disability. The petitioner raised this issue in the motion for new trial.

An incorrect impression that the petitioner was faking her disability could have had some effect at the guilt stage, as the perception of the petitioner as a faker might lend credence to the State's position that the petitioner was a manipulator who got less intelligent people to do the dirty work of killing Musso. The greater impact,

however, probably came at the punishment stage of trial, where the image of the petitioner as someone who would fake a handicap probably was harmful at the punishment stage of trial. The prosecutor pursued that theme in arguing that the petitioner could pose a danger of future acts of criminal violence. This argument made up for the weak evidence as to the likelihood of future violence by calling the petitioner a malingerer and suggesting that her craftiness meant she could manipulate other people in prison.

While this claim might be weak on a stand-alone basis with respect to the second prong of *Strickland*, it should be considered together with the other instances of ineffective representation in determining whether the petitioner was harmed at the punishment stage.

## ARGUMENT SUPPORTING CLAIM FOURTEEN

**The petitioner was denied effective assistance of counsel by counsel's failure to object to the testimony of Scott and Christiana Hardy that the petitioner reduced J.D. O'Malley's brain functioning from that of a 17-year-old to a 12-year-old by the petitioner's continued beatings of J.D. O'Malley**

An additional aspect of ineffective assistance at the punishment stage was the failure of counsel to object to testimony by Christiana Hardy (the petitioner's daughter) that James "J.D" O'Malley's intellect was reduced because he was physically beaten by the petitioner. This was raised in the motion for new trial. This testimony amounted to an opinion on a technical matter which the witness was not

qualified, by training or education, to address. Counsel should have, but failed to, object to this testimony.

The testimony was harmful because it created the appearance that the petitioner had permanently harmed her son by direct abuse.  That could have overcome the argument that the petitioner did not personally strike the blow which actually killed Musso.  Furthermore, it added to the general perception that the petitioner posed a future danger.  Thus the failure to object made it more likely that the State would prevail on the "future dangerousness" special issue. As with the prior claim, this claim may not seem very strong by itself, but it should be considered together with the other aspects of counsel's ineffectiveness.

## ARGUMENT SUPPORTING CLAIM FIFTEEN

**The trial court erred in failing to instruct the jury that the State had the burden of proof beyond a reasonable doubt on the mitigation issue at the punishment stage of trial, denying the petitioner due process of law under U.S. CONST. Amend. XIV.**

TEX. CODE CRIM. PROC. Art. 37.071 makes the assessment of the death penalty dependent upon the jury's answer to a "mitigation" issue submitted under TEX. CODE CRIM. PROC. art. 37.071, §2(e)(1), which requires a jury to decide:

Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

73

If ten or more jurors answer the special issue in the affirmative, life imprisonment is imposed. TEX. CODE CRIM. PROC. art. 37.071, §2(f)(2).  If the jurors stalemate and cannot agree, life imprisonment is imposed. TEX. CODE CRIM. PROC. art. 37.071, §2(g).  That is, the absence of a jury decision on this issue automatically caps punishment at life imprisonment. *Only* if all twelve jurors answer in the negative may the death penalty be imposed. Article 37.071, §2(f)(2).

The statute does not assign a burden of proof.  In cases decided prior to *Apprendi*, the Court of Criminal Appeals has held that there is no burden of proof with respect to the mitigation issue, at least on the face of the statute. *Lawton v. State*, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995).  In practice, *Lawton* recognized, "the burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case."*Id.* In *Lawton* the Court went on to state that it was "unaware of any constitutional requirement that the burden of proof regarding mitigating evidence be placed on either party, and to the extent that the burden is on appellant, we note that it is not unconstitutional to so place the burden."  The authority cited for that conclusion was *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), specifically Part III of *Walton*.

On direct appeal (including the petition for writ of certiorari) and in the state habeas process, the petitioner contended that the burden of proof must be assigned

74

to the State on the mitigation issue, based on *Apprendi v. New Jersey*, 530 U.S. 466,

120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). .*Apprendi* articulated a three-part rule:

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

120 S.Ct. at 2363. Despite the suggestion in some cases (both from the Court of

Criminal Appeals and from federal courts) that a defendant becomes eligible for the

death penalty once the "future dangerousness" special issue is answered affirmatively,

a correct reading of the statute shows that the death penalty cannot be assessed unless

the State prevails on the mitigation issue. Thus the "maximum" without a finding on

the factual comparison made under Section 2(e)(1) is life imprisonment.

The accuracy of the petitioner's position is borne out by other Supreme Court

cases which have applied *Apprendi*. Dissenters in *Apprendi* had argued that the Court

was effectively overruling *Walton v. Arizona, supra*, concerning factors used to

support the death penalty. See *Apprendi*, 120 S.Ct. at 2387-2388 (O'Connor, J.,

dissenting). That step did indeed follow, with respect to a portion of *Walton,* in *Ring*

*v. Arizona*, 536 U.S.584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). *Ring*, relying on

*Apprendi*, overruled Part II of *Walton* as to the judge/jury dichotomy. That part of

*Walton* had received majority support. Part III of *Walton*, which addressed a burden-

of- proof question, was only supported by a plurality. In *Kansas v. Marsh*, __ U.S. __,

126 S.Ct. 2524, __ L.Ed.2d __ (2006) the Court relied on what remained of *Walton*,

75

but *Marsh* did not actually involve application of *Apprendi*.  In fact, *Marsh* never even mentioned *Apprendi*. Perhaps that was because, as *Marsh* specifically noted, the Kansas statute assigned a burden of proof to the State. 126 S.Ct. at 2524.  Actually *Marsh* arguably supports the petitioner's position because it implies that the burden which properly may be placed on the defense is a burden of *producing* mitigating evidence. It is a different matter to assign a defendant the burden of persuasion as to the balance between aggravating and mitigating considerations.

*Ring* did have one other important effect, which was to dispose of the notion that death is necessarily the relevant "maximum" for *Apprendi* purposes, pointing out "*Apprendi*'s instruction that 'the relevant inquiry is not one of form, but of effect.' 530 U.S., at 494, 120 S.Ct. 2348. What mattered was that "the required finding [of an aggravated circumstance] expose[d] [Ring] to a greater punishment than that authorized by the jury's guilty verdict.[17] That same perception of *Apprendi* underlay the decisions in *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004)and *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d

---

[17]   The argument that only the statutory maximum (with all facts decided against the defense) matters was thoroughly discussed and repudiated by an Illinois appellate court in *People v. Nitz*, 319 Ill.App.3d 949, 254 Ill.Dec.281, 747 N.W.2d 38 (2001). *Nitz* observed that *Jones* itself did not involve an increase beyond the absolute maximum found in the United States Code, and *Nitz* concluded that "the fact removed from jury consideration merely has to increase the prescribed range of penalties to which a criminal defendant is exposed." 747 N.W.2d at 52. Later this was clarified by reference to a step up in punishment based on "an additional required finding of fact beyond those facts that the jury determined in the return of a guilty verdict." *Id.* at 53.

76

621(2005), both holding that *Apprendi* applied to incremental increases within a guidelines-type system based on facts not determined by a jury.  As discussed in the next section, the maximum actually authorized by the jury's verdict of guilt is life, and that holds true even after the jury, in its first punishment-stage task, determines that a convicted Capital Murder defendant will pose a continuing threat to society.

An instructive comparison also may be made to California law, as discussed in footnote 14 of *People v. Anderson,* 25 Cal.4th 543, 106 Cal.Rptr.2d 575, 22 P.3d 347 (2001).  The California Supreme Court found *Apprendi* inapplicable to the California death-penalty with this reasoning:

> But under the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death is no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without possibility of parole. ... Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi.*

Under Texas law, in contrast, even when the "future danger" issue is answered in the State's favor, the factual determination to be made under the mitigation issue *does* determine whether the punishment is death or life imprisonment.  The reasoning of *Anderson* implies that *Apprendi* does apply to the Texas mitigation issue.

The petitioner was one of the first two appellants to raise this issue in the Court of Criminal Appeals.  Since that time a number of litigants have gotten farther along

in the process, without any appreciable success.   Similar arguments have been rejected several times by the Court of Criminal Appeals.  *Resendiz v. State*, 112 S.W.3d 541 (Tex. Crim. App. 2003); *Perry v. State*, 158 S.W.3d 438 (Tex. Crim. App. 2004).  The Fifth Circuit also has rejected *Apprendi*-based arguments, including a recent decision in *Oliver v. Quarterman*, No. 06-70600 (November 16, 2007)(Not designated for publication).  Reconsideration en banc was denied in *Oliver*, so it would seem that the Fifth Circuit is not presently inclined to grant relief on this issue.  Nevertheless, the Fifth Circuit's case law  seems to flow from an erroneous analysis in *Rowell v. Dretke*, 398 F.3d 370 (5th Cir. 2005) and, to a lesser degree, from a distinguishable decision  in *Granados v. Quarterman*, 455 F.3d 529(5th Cir. 2006).

In *Rowell, supra* at 378, the Fifth Circuit held that footnote 16 of *Apprendi* approved of drawing a distinction between aggravating factors and mitigating factors, and that *Apprendi* limited its holding to the former. That is *not* the thrust of footnote 16 in *Apprendi*, for in part of that footnote, the Supreme Court stated:

> If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute.  If the defendant can escape the statutory maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone.

530 U.S. at 490, 120 S.Ct. At 2363.  Thus footnote 16 was premised on the idea that

the jury's verdict authorized a particular maximum. This is critical. Under Article 37.071, the jury's verdict of guilty, plus a finding that a defendant poses a danger of future acts of violence, make up the relevant "jury's verdict" for *Apprendi* analysis. This "verdict" will *not* authorize the death penalty. *Only* with a negative answer to subsection 2(e)(1) is death available as a punishment. Footnote 16 in *Apprendi* actually supports the petitioner's position rather than undermining it.

Turning to *Granados, supra*, that case did not actually involve the same claim, and it can be distinguished, but it also should be repudiated. The Fifth Circuit understood Granados' *Apprendi*-based argument to be that "the absence of mitigating evidence is an aggravating circumstance whose presence increases the maximum punishment for capital murder from life to death." *Granados, supra*. Granados' argument failed to perceive the actual role of subsection 2(e)(1) in determining the application of the death penalty. The petitioner is *not* arguing that the absence of mitigating evidence is an aggravating factor.

Although Granados' argument expressed the importance of *Apprendi* the wrong way, the Fifth Circuit also made some errors of its own. *Granados, supra* at 536. First, it is not decisive that all of the elements of Capital Murder were proved beyond a reasonable doubt, for *Apprendi* itself deals with factual questions which raise the maximum punishment above that authorized by the guilt-stage verdict. Second, *Granados* noted that the judge did not usurp the jury's role, but this issue concerns

79

a different prong of *Apprendi*. Third, *Granados* noted that the burden of proof was assigned to the State on the future dangerousness issue, but that is not where the shortcoming in the statute lies. Fourth, it is not simply a question of mitigating evidence being able to "find expression" in the future dangerousness issue.  That notion should have been buried by the decision in  *Penry v. Johnson*, 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001).

The Fifth Circuit stated in *Granados* that "the state was required to proved beyond a reasonable doubt every finding prerequisite to exposing Granados to the maximum penalty of death." *Granados*, *supra* at 536.  That statement is not accurate. In light of the way the Texas statute is structured, the maximum is life imprisonment unless the mitigation special issue (for which the State definitely is not assigned a burden of proof) is answered in the State's favor.  This Court went on to state that "a finding of mitigating circumstances reduces a sentence from death, rather than increasing it to death." *Granados*, *supra* at 537.  For reasons already stated, that is incorrect.

The Fifth Circuit also rejected an *Apprendi*-based argument in *Scheanette v. Quarterman*, 482 F.3d 815 (5th Cir. 2007). That case relied on *Granados* and *Rowell* and plowed no new ground.

If the petitioner is correct on the existence of constitutional error, then she was harmed if there was any evidence which the jury could have considered to be

mitigating.  Because of the denial of funding for a mitigation expert and the failure

of defense counsel to conduct an adequate mitigation investigation, there was far less

mitigation evidence than there should have been, but in theory the Apprendi problem

arises if the defense produced any mitigating evidence.

### ARGUMENT SUPPORTING CLAIMS SIXTEEN AND SEVENTEEN

> **The court's refusal to read back Dr. Quijano's testimony, pursuant to a Texas statutory restriction, violated the petitioner's Eighth Amendment right to greater reliability in the jury's determination of punishment-stage issues.**

> **The court's refusal to read back Dr. Quijano's testimony, pursuant to a Texas statutory restriction, violated the applicant's Fourteenth Amendment right to due process of law.**

These two grounds are related and should be considered together.  Although

the mitigation evidence presented was far less than it could have been, there was

testimony from defense witness Walter Quijano with respect to future dangerousness.

Quijano drew upon his experience working within the prison system and explained

why the petitioner, if incarcerated for at least forty years, would not pose a continuing

threat of future acts of violence.

The jury sent out a note specifically asking for a transcript of Dr. Quijano's

testimony (CR I-E-1459). Normally a Texas court will not provide a transcript to

jurors, but it will read back testimony in open court (which assures that both sides are

in attendance when evidence is presented to the jury).  Since the jury note did not

indicate that the jury was in disagreement about some particular testimony given by Quijano, the trial court refused the request, based on a Texas rule that jurors can only have testimony read back only if they indicate a disagreement between jurors as to what was said.

This Texas rule arbitrarily denied the petitioner the right to have jurors fully consider mitigating evidence. To begin with, Quijano's testimony was complicated. He dealt with concepts which jurors do not encounter in their everyday lives, and the way in which Quijano's ideas came together to support the defense position probably would not be clear from simply hearing Quijano's testimony one time. A sophisticated explanation of a concept can rarely be reduced to one or two questions, so it was asking too much of the jury to zero in on a particular fragment of Quijano's testimony as to which there existed a disagreement. The jury's confusion may have been at such a fundamental level that they could not have articulated the disagreement with precision.

Since the defense was relying so heavily on Quijano, the net effect of denying the jury's request or denying a reading of the testimony was to deny the petitioner a fair chance to have the jury deliberate on Quijano's testimony. As stated earlier, *Crane v. Kentucky, supra* recognized a "right to put on a complete defense" as a component of Fourteenth Amendment due process. In this case the jury, according to its note, was not given a sufficient exposure to Quijano's expert opinion to evaluate

it.  In effect a central part of the petitioner's defense was kept from the jury.

Complementing the Fourteenth Amendment "right to put on a complete defense" is the Eighth Amendment requirement of heightened reliability in death penalty cases. *Gilmore v. Taylor, supra*; *Herrera v. Collins*, *supra*.  The jury made it clear that at least some of the jurors had not absorbed what Quijano said.  It is not enough for jurors to hear evidence if the record indicates that what was heard was not understood.

### ARGUMENT SUPPORTING CLAIM EIGHTEEN

**The court denied the petitioner a trial satisfying the Eighth Amendment's heightened reliability requirement by not answering the jury's specific request for a definition of the key phrase "criminal acts of violence."**

The petitioner was denied a fair trial on punishment because the jury was confused about a critical term used in the first special issue.  That issue, submitted under TEX. CODE CRIM. PROC. Art. 37.071, §2(d), calls upon the jury to decide whether there is a probability that a defendant will commit future criminal acts of violence such as to be a continuing threat to society.  This issue was the major bone of contention in the punishment arguments.  The defense attorneys spent almost all of their time on this issue rather than on the mitigation issue.  The prosecutor, with the advantage of speaking last, argued to the jury that the petitioner's history of manipulating people made her a potential future danger.  During deliberations, the

jury sent out a note which asked "What is the legal description [sic][18] of ... criminal acts of violence?" (CR I-E-1456).  The judge replied that the jury already had all the legal definitions it was going to get.

It is well established in the case law that certain terms used in the "future dangerousness" special issue need not be defined.  It does not appear, however, that that the earlier cases dealt with a situation where the jury actually sent out a note asking for a definition.  The issue always has arisen in the context of general attack on the statute as being vague, and the rationale in the cases has always been that these were terms with commonly understood meanings. The jury note in this case establishes, however, that the jury (assuming it knew the "commonly understood meaning") did *not* understand how it applied to this case.  Therefore there is no contradiction between the established case law and a limited holding that a specific jury note requires an explanation.

The factual point on which the jury was confused was probably decisive, given the competing positions taken by the parties.  The prosecutors had relied largely on the theory that the petitioner was manipulative and was willing to order physically stronger people to carry out her orders, including orders to hurt someone. The State even exploited this theme on cross-examination of Dr. Quijano:

---

[18] The jury presumably meant "definition."

Q.  If a person has a history of going around and manipulating people and a history of chronically lying[,] what does that tell you about that person?

A.  That type of person would have what is called antisocial features.

Q.  Okay.  So the person who chronically lies?

A.  Yes.

Q.   And manipulates others is a person that you would describe as having antisocial tendencies?

A. Yes.

Q.  And is that the type of person who poses the greatest danger?

A.  The antisocial person, yes.

(RR XXXV- 252-253).  That exchange could have confused the jury into thinking that mere lying was probative of "criminal acts of violence."

In the end what matters is that the jury did not know the answer to a question which was central to a finding which was a *sine qua non* for the death penalty under Texas law. The obvious jury confusion, which the trial court failed to remedy, undermined the heightened reliability required by the Eighth Amendment in a capital case.

## ARGUMENT SUPPORTING CLAIMS
## NINETEEN, TWENTY, AND TWENTY-ONE

**The jury charge affirmatively misled the jury as to the numerical requirements for a negative answer to special issues which would lead to life imprisonment, violating the Sixth Amendment right to trial by jury.**

**The jury charge affirmatively misled the jury as to the numerical requirements for a negative answer to special issues which would lead to life imprisonment, violating the Eighth Amendment because it undermined the reliability of the verdict.**

**The jury charge affirmatively misled the jury as to the numerical requirements for a negative answer to special issues which would lead to life imprisonment, in violation of the Fourteenth Amendment due process clause.**

Three grounds for relief which were raised in the state habeas application can be considered together here as well.  The jury was told the number of jurors required to agree in order for the three special issues at punishment to be answered (CR I-E-163-1464), but the jurors were not told that the trial court was required to assess a life sentence if the jurors were unable to answer one of the special issues.    The instruction as to the numbers required for a verdict not only was an incomplete statement of the law, but may have misled the jurors as to what each juror's role was.

Three constitutional rights were violated by this omission of applicable law.  It  effectively denied the petitioner of the right to trial by jury, in that jurors were kept in the dark as to the full importance of each juror's consideration of the evidence.  It reduced the reliability of the fact-finding proceeding, in conflict with the Eighth

86

Amendment's mandate of greater reliability in a death-penalty case. The "veto power" of each juror is the type of "additional protection" which *Herrera* mentioned in this context. An instruction which misleads a jury also can be viewed as a denial of due process of law.

The petitioner's biggest problem with these issues may be the limitations of federal habeas review, but *Jones v. United States*, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) recognized that a jury may not be "affirmatively misled" regarding its role in the sentencing process. The Supreme Court found that not to have occurred in *Jones*, but federal sentencing is a vastly different process from what the jury does in a Texas capital case. *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) held that a prosecutor may not argue in a way that leads jurors to think they do not have responsibility for determining whether the death penalty will be assessed. An instruction from a court which is only half right about each juror's role – a role which gives each juror the power to prevent the death penalty by holding out on the basis of his or her own reasonable doubt, rather than thinking other jurors must be brought into line  – is as bad as the problem in *Caldwell*.

The state habeas court's rejection of these claims was an unreasonable application of *Jones*, *Caldwell*, and other similar cases.

### ARGUMENT SUPPORTING CLAIM TWENTY-TWO

**If any issues raised on state habeas was procedurally defaulted by not being raised on direct appeal, the petitioner received ineffective assistance of counsel on appeal.**

A defendant is entitled to effective assistance of counsel on appeal. If this Court is of the view that the petitioner procedurally defaulted any issue raised in the state habeas application because it should have been raised on direct appeal, then the petitioner did not receive effective assistance of counsel on appeal. This is a very limited issue, in that it would only justify abatement of federal proceedings while an out-of-time direct appeal was in process, but that relief is better than losing an issue entirely without consideration of the merits.

### VIII.

### REQUEST FOR AN EVIDENTIARY HEARING

The petitioner requests an evidentiary hearing, especially on the ineffective assistance claims. The difference between this cause and *Gonzalez, supra* may lie in the fact that Gonzalez was able to get a hearing. The petitioner asked for a hearing in the state habeas court, but that court denied the request.

This situation illustrates one of the great flaws of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA): while Congress was attempting to implement a habeas situation more deferential to state courts, it did nothing to require state courts to provide a full and fair review (and in particular, an evidentiary

88

hearing).  The treatment of death-penalty writs in Texas is inconsistent because different judges may be more or less willing to grant an evidentiary hearing.

## <u>CONCLUSION</u>

Wherefore the petitioner prays that this Court vacate the judgment of the 232nd District Court and order a new trial, on guilt or on punishment.

Respectfully submitted,


/s/_____
Winston E. Cochran, Jr.
Attorney at Law
Texas Bar No. 04457300
SD Texas No. 14490
P.O. Box 38465
Houston, TX 77238-8465
Tel. (713) 228-0264
Fax (281)894-2705
Counsel for Petitioner

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of this motion was electronically delivered to counsel for the respondent at the following address on this the 21st day of February, 2008:

Attorney General of the State of Texas
Postconviction Litigation Division
Attn: Tina J. Dettmer Miranda
P.O. Box 12548
Austin, TX 78711

/s/_____
Winston E. Cochran, Jr.
Counsel for Petitioner

89